IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

Judgment of affirmance.

John Sleght and Cornelius Sleght, } *Plaintiffs in error.*

*against*

Hartshorne, Rhinelander, and others. } *Defendants in error.*

IN error from the supreme court. This was an action on a policy of insurance, on the *cargo* of the brig *Three Friends*, on a voyage from *New-York* to *New-Orleans.* At the foot of the policy was the following clause :— " N. B. The vessel sails under a *sea-letter* without a re- " gister. Property warranted *American;* proof to be " made here only."

A new trial having been granted in this cause, (see vol. 1. p. 192.) it was again tried before Mr. Justice *Thompson*, at the sittings in *New-York*, in *June*, 1806, when a *bill of exceptions* was taken to the opinion of the court, on several points which arose at the trial.

The bill of exceptions stated the proofs given, and offered to be given, by the plaintiffs at the trial. The policy, interest of the plaintiffs in the property insured, the sailing of the vessel on the voyage, a total loss by foundering at sea, the usual preliminary proofs, an abandonment in due season, and that the plaintiffs were *American* citizens, were either admitted or proved as stated in the bill. It

See 1 *Johnson*, p. 192. A policy of insurance contained the following clause: "The vessel sails under a *sea letter*, without a register: property warranted *American.*" It was held, that parol evidence was admissible to explain what document was meant by a sea-letter.

(a) Vide Andrews and others v. The Marine Insurance Co. 9 Johns. Rep. 32.

IN ERROR.    was further proved, that the vessel had on board bills of

ALBANY,    lading and an invoice of the cargo; and a regular clear-
Feb. 1807.    ance from the custom house in *New-York*, and also a
document, signed and sealed by the collector and naval

Sleght    officer of the district of the port of *New-York*, in the words
v.
·Hartshorne    and figures following, to wit:
and others.

No. 36, Thirty-six.

*United States of America.*

District of the port of *New-York*, in the

State of *New-York*.

WE, *Joshua Sands*, collector, and *Rich-
ard Rogers*, naval officer, of said district,
do hereby certify, that *Cornelius Sleght*,
of the city, county, and state of *New-York*,
merchant, has taken and subscribed an

**L. S.**    oath, that he is a citizen of the *United
States*, and that he, together with *John

Joshua Sands,    *Sleght*, of the said city, merchant, are the
Collector.    only owners of the ship or vessel called
the *Three Friends*, of *New-York*, whereof
*Jesse Bowers* is at present master, and is
a citizen of the *United States*; that there
is no subject, or citizen, of any foreign
prince, or state, directly, or indirectly,
by way of trust, confidence, or otherwise,
interested therein, or in the profits, or
issues thereof: And *John Lasher*, sur-
veyor of this port, hath certified that the
said ship or vessel has two decks and two
masts, that her length is seventy-four
feet six inches, her breadth twenty-two
feet one inch, her depth eleven feet and
an half inch, and that she measures one

**L. S.**    hundred fifty-seven 20-95 tons; that she
is a square sterned, and round tucked
R. Rogers,    brig, has no galleries and no head.
Naval Officer.

Given under under our hands and seals, at the port of *New-York*, this twenty-ninth day of *September*, in the year one thousand seven hundred and ninety-eight.

[*]District of the city of *New-York.*

WE certify, That the foregoing is a true copy of the certificate of ownership of the brigantine *Three Friends*, *of New-York*, issued at this port, taken from the original lately surrendered in this office.

Port of *New-York.*

Given under our hands and seals of office, at the custom house of this port, this twelfth day of *July*, in the year one thousand seven hundred and ninety-nine.

JOSHUA SANDS,
  *collector.*       L. S.

R. ROGERS,
  *naval officer.*     L. S.

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

[* 533]

The plaintiffs further proved, that the said brig, at the time of her sailing on the said voyage, and during the same, was not entitled to be registered as a registered vessel of the *United States;* and that the said document is always granted at the custom houses of the *United States*, to ships or vessels of the citizens of the *United States*, not entitled to be registered, upon the oath of the owner or owners, or some of them proving that such vessels are, *bona fide, American* property ; and that the same is a proper and customary document for such ships or vessels, and as such has been approved by the executive government of the *United States.*

The plaintiffs further offered to prove, that the said words, " N. B. The vessel sails under a sea-letter, without a register," according to their true intent and meaning, and the general acceptation and understanding of the said terms among merchants, and between insurers,

IN ERROR.

ALBANY,
Feb 1817.

Slegli!
v.
Hartshorne
and others.

[*534]

and insured, within this state, at the time of making the said policy, and according to the commercial import of the same, imported, that the said vessel sailed with such document as is above set forth, signed and sealed by the collector and naval officer; to which proof the defendants objected, and insisted, that the plaintiffs ought to show, that the said vessel had on board a passport or sea-letter, [*]according to a form prescribed by the treaties between the *United States* and *France*, of the 8th *February*, 1778, and between the *United States* and the *United Netherlands*, of the 8th *October*, 1782, and between the *United States* and his most Catholic Majesty, of the 20th *October*, 1795; whereby the vessels of either party, when the other is at war, are required to produce certain letters, or passports, according to a form prescribed by and annexed to those treaties. The defendants' counsel, also, in support of their objection, produced and proved an official letter from the secretary of the treasury of the *United -tates* to the collector of the port of *New-York*, received when it bears date, as follows:

*Treasury Department, May* 13th, 1793.

SIR,

"It being necessary in the present state of war among the principal *European* powers, that all ships and vessels, belonging to citizens of the *United States*, should be furnished, as soon as possible, with sea-letters, for their more perfect identification and security; you will find, within the enclosure, ten copies of two several documents of that kind signed by the President of the *United States*, and countersigned by the secretary of the department of state, which have been received from that department, for the purpose of being transmitted to the several custom houses. One of each of these letters is to be delivered to every ship or vessel being actually and *bona fide* the property of one or more citizens of the *United States*, after the captain shall have duly made oath to the effect,

and according to the tenor of the certificate, printed under that which is in *Dutch* and *English*, the substance and purport of which oath is comprised in the 10th, 11th, 12th, 13th, 14th, and 15th lines of the said printed certificate. To this the captain is to be duly sworn, before some officer qualified to administer oaths, such as a justice of the peace, an alderman, or any other inferior judicial officer, preferring the mayor, chief burgess, or other officer (if any there be) who is the chief magistrate of the city, town, [\*]or borough, in which the issuing custom house is situated. The certificate is then to be signed by the magistrate; and the public seal (or if he has no public one, his private seal) is to be affixed. The blanks are to be filled up both in the *English* and *Dutch* copies of the sea-letter, by the collector, and in both the *English* and *Dutch* copies of the certificate, by the magistrate or judge. The *English* language may be used in filling the blanks in both the *English* and *Dutch* papers. The blanks in the two papers vary, owing to a little difference in the words which bound them. This is produced by the want of a perfect similarity between the idiom of our language and that of the *Dutch*.

You will acknowledge the receipt of all the sea-letters you shall receive from time to time, and you will keep a record thereof, and of your disposition of them, showing the names of the vessels (with their masters and owners) for which they were issued, the ports of the *United States* to which the vessels shall belong, the date at which you issue them, the officer before whom the captain shall be sworn, the burdens or tonnage of the vessels, and the ladings on board of them.

Of these you will be pleased to make an abstract by way of return, up to the last day of every revenue quarter, and to transmit the same to this office, with a note of the sea-letters received and issued during such quarter, and of the quantity remaining on hand.

IN ERROR,

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

[* 535]

IN ERROR.

ALBANY.
Feb. 1807.

Sleght
v.
Hartshorne
and others.

These documents being of great importance to the United States, not only as they regard the benefits to be derived from the state of peace by the owners, navigators, and builders of ships, but also as they affect the importation of our supplies, and the exportation of our produce, at peace charges, you will execute the business in relation to them with proportionate circumspection and care.

I am, Sir, with consideration,

Your obedient servant,

A. HAMILTON.

JOHN LAMB, Esq.
    *Collector of customs for N. Y.*

[* 536]

[*] The counsel for the defendants also showed the form of the sea-letter referred to in the said letter, and which was proved to be according to the form annexed to the said treaties, under the seal of the *United States of America*, subscribed by the president, and countersigned by the secretary of state, in four different languages on the same paper, viz. the *English*, (which is a correct translation of the other three,) the *French*, *Spanish*, and *Dutch* languages; and they produced two of the said letters, which had been granted to the vessels therein named; one for the ship *Henrietta*, from the port of *Philadelphia*, dated the 21st day of *July*, 1797, on a voyage from thence to *Curracoa* in ballast: and the other for the sloop *Pilgrim*, from the port of *New-York*, dated the 5th day of *September*, 1804, on a voyage from thence to *New-Providence*, with a cargo, of which the *English* part is as follows; those parts of which that were written, being in *italics*, the printed parts in *roman* characters.

"THOMAS JEFFERSON,

President of the *United States* of *America*.

To all who shall see these *Presents*, GREETING :

BE it known, that leave and permission are hereby given to *Astoppe Robinson*, master and commander of the *sloop* called the *Pilgrim*, of the burthen of 39,86-95

tons, or thereabouts, lying at present in the port of *New-* IN ERROR.
*York*, bound for *New-Providence*, and laden with *pork*,
*potatoes, geese, onions, hogs, sheep, boards, corn, fowls ducks*, ALBANY,
to depart and proceed with his said *sloop* on his said voy- Feb. 1807.
age, such *sloop* having been visited, and the said *Robin-* Sleght
*son* having made oath before the proper officer, that the Hartshorne
said *sloop* belongs to one or more of the citizens of the and others.
*United States* of *America*, and to him or them only.

In witness whereof, I have subscribed my name to these
presents, and affixed the seal of the *United States* of *Ame-*
*rica* thereto, and caused the same to be countersigned by
*David Gelston*, collector of the customs at *New-York*, the
5th day [*]of *September*, in the year of our Lord Christ, [* 537]
1814.

TH. JEFFERSON.

(SEAL.)

By the President,
JAMES MADISON, secretary of state.
Countersigned,
DAVID GELSTON.

" Most serene, serene, most puissant, puissant, high,
illustrious, noble, honourable, venerable, wise and pru-
dent, lords, emperors, kings, republics, princes, dukes,
earls, barons, lords, burgomasters, schepens, counsellors,
as also judges, officers, justiciaries and regents of all the
good cities and places, whether ecclesiastical or secular,
who shall see these patents, or hear them read. We,
*Maltby Gelston*, of *New-York*, notary public, make known,
that the master of the sloop *Pilgrim*, appearing before us,
has declared upon oath, that the vessel called the *Pilgrim*
of *Mount Pleasant*, of the burthen of about 39, 86-95 tons,
which he at present navigates, is of the *United States* of
*America*, and that no subjects of the present belligerent
powers have any part or portion therein, directly nor in-
directly, so may God help him. And, as we wish to see
the said master prosper in his lawful affairs, our prayer

IN ERROR.

ALBANY,
Feb. 1 07.

Sleght
v.
Hartshorne
and others.

is, to all the before mentioned, and to each of them sepa-
rately, where the said master shall arrive, with his ves-
sel and cargo, that they may please to receive the said
master with goodness; and to treat him in a becoming
manner, permitting him, upon paying the usual toll and
expenses, in passing and repassing, to pass, navigate, and
frequent, the ports, passes and territories, to the end to
transact his business where, and in what manner, he shall
judge proper: Whereof we shall be willingly indebted.
In witness, and for cause whereof, we affix hereto the
seal of our office, in the city of *New-York*, the 5th day
of *September*, 1804.

(Seal.)                         M. GELSTON, N. P."

[*538]          [*]The sea-letter being thus established, and its form
prescribed by law, the defendants insisted, that the judge
ought to admit the testimony of witnesses, to prove the
understanding or acceptance of merchants to the effect
proposed, and the judge was of opinion, that the testimo-
ny was improper, and refused to admit it.

The plaintiffs then further offered to prove that the
said paper or document, signed by the said collector and
naval officer, and so given in evidence by them, was usu-
ally called a *sea-letter,* which evidence was also objected
to on the part of the defendants, and refused to be admit-
ted by the court.

The plaintiffs then further offered to prove, on the said
trial, by four of the underwriters who had underwritten
the same policy, prior to the above-named defendants, *and
had paid the loss,* that their sense and understanding of the
said terms, " N. B. The vessel sails under a sea-letter,
without a register," at the time of subscribing the said
policy, was, that they imported, that the said brig sailed
with such a document or paper, signed and sealed by the
said collector and naval officer, as was given in evidence
by the said plaintiffs, to which testimony the defendants
also objected, and the court also refused to admit the
same.

The plaintiffs, on the said trial, further *proved*, that in pursuance of the act of the congress of the *United States*, entitled, " an act supplementary to the act entitled an act providing passports for the ships and vessels of the *United States*," passed the 2d *March*, 1803, and the act therein referred to, the pass commonly called the *Mediterranean* pass, mentioned and intended in and by the said acts, according to the course and practice of the custom houses of the *United States*, approved by the executive government thereof, would be granted to a vessel sailing with such document or paper only as above set forth, signed and sealed by the said collector and naval officer, as the said brig sailed with on the same voyage, and not to any [*]vessel sailing without such document or paper, and also without a register.

And thereupon the plaintiffs, by their counsel, insisted the law upon this evidence, and the premises, to be, that the said terms, " N. B. The vessel sails under a sea letter, without a register," as contained in the said policy, did not amount to a warranty that the said brig sailed with any other document or paper than the one above shown by the plaintiffs to have been on board of her ; and they desired the judge so to charge the jury on the said trial ; but the counsel for the said defendants objected thereto, and the said justice refused so to do, but, on the contrary, did charge the said jury, that the said terms last mentioned did amount to a warranty on the part of the plaintiffs, that the said brig sailed on the said voyage with another document or paper called a sea-letter, according to the form of the sea-letter produced by the defendants, and that for the want thereof the said plaintiffs were not entitled to recover ; in pursuance of which charge and opinions of the said justice, the said jury found a verdict for the defendants, upon which judgment has been rendered in their favour.

VOL. II. 3 C

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

[* 539]

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

Upon this bill of exceptions the cause was brought by writ of error to this court. The reasons assigned were the same as given by the supreme court. The cause was argued by *Radcliff* and *Hoffman*, for the plaintiffs in error, and *Harison* and *Pendleton*, for the defendants in error. [See the arguments and authorities cited, on the motion for a new trial, in the court below, vol. 1. p. 192.]

The CHANCELLOR. In the mode in which this cause has been presented for the consideration of the court, its decision must necessarily depend upon a simple point. That point is, whether the term *sea-letter* is so determinate, in its legal signification, as to admit of no incertitude in its *appropriate and exclusive* application to the species of document described by that term in the policy; for it is not, [*]and cannot now be contended, if the object of the policy is clear and unambiguous, if it has a plain and obvious meaning on its face, that parol proof can vary or contradict it. For if the terms of the policy are sufficient of themselves unequivocally and satisfactorily to express its legal intent; if the object to which it is to attach is described in language capable of a clear and certain application, that intent must prevail, and cannot be varied by resorting to the more fallible evidence of witnesses.

[* 540]

Should it, upon examination, appear, that the terms in which the policy is conceived are sufficient to afford their own exposition, then the evidence offered was properly overruled; if they are not sufficient, then it was competent for the plaintiffs to prove the intent *aliunde*. The construction of mercantile instruments, it has been urged, should be liberal, agreeable to the real intent of the parties, and conformable to the usages of trade in general, and of the particular trade to which the contract relates. The soundness of those positions is not to be questioned; but to give the intent effect, it should be expressed in the mode prescribed or permitted by law. The danger of wandering from the form in which the parties have ar-

ranged their contract, in quest of extrinsic matters of elu- IN ERROR.
cidation, has always had a considerable influence on ad- ALBANY,
judications, involving questions of that nature. Hence, Feb. 1807.
the rule to restrain them has been settled with great at- S.ght
tention and care, and though there are still some diversi- v.
ties of opinion, as to its application to particular cases, it Hartshorne and others.
is now considered as a settled rule, that no parol proof is
to be admitted to vary, impugn, or explain a written con-
tract of plain and obvious meaning. It will be recollect-
ed, that every description of the properties of the subject
insured, in the policy, whether inserted in its body, or in-
troduced by way of explanatory note, as in this instance,
is, by the settled rule of construction of policies, *a warran-
ty ;* that a conformity to such description is strictly and
literally [*]exacted, it being immaterial with what view, [* 541]
or for what purpose it is made, on the ground, that its in-
sertion is for the benefit of the insured, operating to re-
duce the premium, by providing for a diminution of the
risk in the particulars to which it is intended to apply, or
to identify the subject insured. It will also be recollect-
ed, that when the term *usages of trade* is made use of, it
admits of an application, either to the general usages of
trade, which compose the *Law of Merchants,* of universal
authority among commercial men in civilized societies,
and forming one of the constituent parts of the laws of
this state, as *the general law of the land,* or to usages of lo-
cal origin, or prevailing in a particular branch of trade.
The former are considered in the nature of those positive
laws, of which every member of the community is pre-
sumed to be conusant, and which are resorted to as known
and established tests of contracts, in all cases arising un-
der them. The other depends upon the usage of the per-
sons engaged in the traffick to which they apply, the
knowledge of which is not legally imposed on the com-
munity, but derives its binding force from the supposed
knowledge of the persons engaged in that particular spe-

IN ERROR.

ALBANY,
Feb. 1807.

: leg' ,i
v.
Hartshorne
and tiers.

cies of traffick, at the place, or in the trade in which it obtains. The latter may be proved by witnesses.

By the evidence offered and overruled in this case, it was not pretended to support a particular usage; it was to show, that the paper, denominated in the certificate of the collector and naval officer of the port of *New-York*, a *certificate of ownership* was, in the general *acceptation and understanding* of the term, *sea-letter*, between merchants, and between insurers and insured, within this state, *at the time of making the said policy*, and according to the commercial import of the same, a *sea-letter*. This evidence was not directed to the point of establishing a *practice*, which, in its locality, or otherwise, constituted a particular usage. It was to be the *general acceptation* and understanding, not in a particular trade, or at a particular place, [*]but throughout the state; not uniformly for a series of years, but at the *precise time of making the policy;* thus attempting to substitute opinion for usage, and presenting the period of making the contract, unconnected with any progressive practice, which is essential to establish it as a particular custom of trade, and undertaking to show the sense of the merchants, insurers, &c. insured throughout the state, at that time. If the terms in question were of naval invention, unknown to our laws, introduced into limited use, by any of the variety of circumstances by which in the progress of the arts and the ever-changing pursuits of mankind, they are daily devised among artists, or others, in whose peculiar branch of business they are used, there could be no rational objection to admit the evidence of persons conversant with their import and meaning to explain them. But here the terms are formed in the codes of nations;* they enter into the regulations of the external and maritime intercourse of the *United States* with others; they have been introduced into their treaties with *France, Spain*

[* 542]

* *March.*317 *Hubner, de la Sais. des Bat. Neut.* part 1. ch. 3. sec. 10.

and the *Dutch*;† they have received an executive exposition, by the practice, which has obtained, by its direction in the custom houses of the *United States*; and the term *sea-letter* is uniformly applied throughout, excepting in the law of congress,‡ which directs the secretary to prepare the form of *passports*, (the synonyma, in those treaties, of *sea-letters*,) but in that case the secretary devises the form, and in his letter transmitting the blanks to the custom houses in this state, and which is in evidence in this cause, he denominates them *sea-letters*.

In the case of *Rich* v. *Parker*,§ it was held, that the sea-letter was an essential paper. The inconveniences which might arise from not carrying it, are stated; and the reasoning on the subject would go a great way to decide this cause, if it required the application of the principles laid down in that case. The counsel who argued this cause on the part of the plaintiffs, entered into an examination [*]of the utility of the *sea-letter*, as to the protection it afforded to the vessel against captures. It is not necessary to follow them in this inquiry, as the view with which the stipulation was made in this case is perfectly immaterial. It was an express stipulation, that the vessel carrying the cargo insured should sail with a *sea-letter*, and this must be shown to have been done to bring it within the policy.

Another object of the evidence offered and overruled, was to show, that the *certificate* was, according to its commercial import, a *sea-letter*. The commercial import must, of necessity, be tested by the general law of merchants, and is not to be collected from the evidence of witnesses. The certificate of ownership contains no intimation that it is in the nature of a passport. Its objects are exclusively to identify the vessel, its master, owner, cargo, and national character.

That the loss in this case did not happen by capture; that it was occasioned by *the ordinary perils of the sea*,

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

————

† 25 *Articles with France,* 17. *Art. with Spain,* 25. *Art with the Dutch.*
‡ *Laws U. S.* 219. *March 2d,* 1803.
§ 7 *Term Rep.* 705.
2 *Esp. Rep.* 615.

[* 543]

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

does not place the plaintiffs in a better situation. If a warranty is in the nature of a condition precedent, the cargo was never in the situation described in the policy. It was not on board of a vessel of the description indicated, and if so, the policy never attached.

For these reasons, I have no doubt that the evidence offered was properly rejected, and that the judgment of the supreme court ought to be affirmed.

CLINTON, Senator. In order to arrive at a just decision in this case, it is proper to consider it in two points of view. 1. Whether the word *sea-letter* has the precise technical meaning in law, with the document produced by the plaintiffs? and, 2. If it has not, whether the doubts that may arise on this subject ought to be satisfied, or explained away by *parol* testimony?

In *Marshall*, (page 317.) a distinction is made between a *passport* and *sea-letter*. The former is defined to be a permission from a neutral state, to a master of a ship, to proceed on the voyage proposed, and usually contains his name and residence, the name, description, and destination[*] of the ship, with such other matters as the practice of the place requires. This document he describes as essentially necessary for the safety of every ship. The *sea-letter*, according to him, specifies the nature and quantity of the cargo, the place from whence it comes, and its destination, and is not so necessary as the *passport*.* In our treaties with *France*, *Holland*, and *Spain*, sea-letters and *passports* are used synonymously; and are to express the name, property, and bulk of the ship, and also the name and place of habitation of the master. They, therefore, relate solely to the *vessel*. A distinct provision is made relative to the *cargo*, and which renders necessary a certain document called a *certificate*, which is to specify the particulars of the cargo, the place from whence the ship sailed, and where she is bound. It is now contended by the plaintiffs, that the instrument denominated a

[* 544]

* See also, *d'Abir's jur polit. d los presas*, part i. ch. 2. sec. 3, 4, 5, 6.

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

*sea-letter* is the certificate of ownership, given at the custom houses of the *United States*, to citizens of the *United States*, in cases where a register cannot be obtained. From this it appears, that much ambiguity and confusion have prevailed on the subject. According to the writer I have quoted, it refers solely to the *cargo*. According to the treaties above mentioned, it refers exclusively to the ship, whether registered or unregistered; and, according to the principles set up by the plaintiffs, it applies only to unregistered vessels, entitled to certificates of ownership. It will, therefore, require some attention and patience to find our way through the darkness which surrounds us.

It has been the policy of the *United States*, in common with other commercial nations, to encourage their own ships. Our navigation act enumerates and describes certain vessels, and emphatically denominates them *ships or vessels of the United States*. Their distinguishing characteristics are, that they are built, owned, and commanded by citizens of this country. They are registered with the collector, and are entitled to a certificate, called a *register*. The register is of itself considered a competent [*]document, to prove the ship *American;* and would, in most cases, serve as a sufficient protection against capture. But cases occur, wherein this register is not granted to vessels owned by citizens of the *United States*. The principal case is where the vessel is built out of the country. In such case, the collector cannot grant a register; but it being proper and necessary, that the owner should have some document to protect his property against the rapacity of cruisers on the ocean, and to establish his neutrality, a *formula* has been devised, and is granted, called a certificate of ownership. With a view to the encouragement of ship-building in this country, a discrimination is also made in the duties of tonnage. Ships of the *United States* pay at the rate of 6 cents per ton; ships built with-

[* 545]

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

in the *United States* after a certain period, but belonging wholly, or in part, to foreigners, 30 cents per ton ; and all other ships, 50 cents per ton.   Hence, under both heads, of ownership and the place of building, all vessels are considered, by our laws, under four distinct views. 1. Vessels of the *United States*.   2. Vessels built in the *United States*, owned by foreigners.   3. Vessels built out of the *United States*, owned by citizens.   4. Vessels built out of the *United Ssates*, owned by foreigners.

Vessels of the first and third classes, being owned by citizens, are entitled to the protection of the government. The second and fourth classes, being owned by foreigners, cannot receive any documents, which would, in the least, protect them from capture.   To encourage our own ship-building, vessels of the *United States* pay but a small duty of 6 cents.   Vessels built and owned here, by foreigners, pay a duty of 30 cents; and, if our citizens will go into foreign countries to build, or to purchase vessels, they are put on the same footing as foreigners, owning foreign vessels, with regard to the rate of duties, although as citizens, they have a right to demand the protecting hand of the government, for their property.   Hence arises the division of vessels owned by citizens, into two [*]classes : vessels of the *United States*, or registered vessels, and vessels belonging to the citizens of the *United States*, *certificated*, but not *registered*.   The owners of the latter description of vessels, considering this certificate of ownership as a sufficient shield for neutral property, denominated it a *sea-letter ;* and it may have obtained that appellation at the time our first navigation act was passed, which was in the year 1789, some years before the letter from the secretary of the treasury, set forth in the bill of exceptions, was written.   This term was, at a subsequent period, engrafted into our statute book, as I shall presently show.

[* 546]

OF THE STATE OF NEW-YORK.

In the year 1793, when a general war was kindled in *Europe*, the President of the *United States*, in order that our vessels might enjoy the benefits stipulated by treaties, and be generally protected against the depredations of the belligerents, ordered documents to be furnished from the custom-houses, *to all ships and vessels belonging to citizens of the United States.* This document is denominated, in the letter of the secretary of the treasury, a *sea-letter*, and is the *formula* of the passport adopted in the treaties, and was given to certificated, as well as to registered vessels. This was a mere executive regulation, unauthorized by any existing statute, and so it continued, until the 1st of *June*, 1796, when an act was passed, directing the secretary of state to prepare a form, which, when approved of by the President, should be deemed *the form of a passport, for ships and vessels of the United States.* The form adopted, was the same as described in the treaties. It was so constructed, in order that we might have the benefit of those treaties. The passports exhibited by the plaintiffs, were issued subsequent to 1796; and although conformable to the *formulas* prescribed in the treaties, they emanated from this statute. And here two remarkable circumstances occurred; the term *sea-letter* in the treaties was dropt in the statute, and the word *passport* adopted; and the passport was only authorized to be granted to *registered vessels.* This must have been considered as a [*]negation of the right of the executive, heretofore exercised, of granting passports to certificated vessels. Hence the *certificate* of *American* ownership, being their only guard, this *certificate* was, emphatically, denominated their *sea-letter*, or protection.

The case before us occurred in the year 1798, two years after the passing of the statute, authorizing the granting of passports only to registered ships. Inconveniences having been sustained from this discrimination, and certified ships being thus deprived of so important a

VoL. II.                    3 D

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

[*547]

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

document, a law was passed on the 2d day of *March*, 1803, and directing, that every unregistered ship or vessel, owned by a citizen or citizens of the *United States*, and sailing with a sea-letter, going to any foreign country, should be furnished with a passport, prescribed in the former act, for ships and vessels of the *United States*. This statute is one of the only two that contain the term *sea-letter*, and that it is used here in the sense of a certificate of ownership, cannot be doubted. A *passport* is to be granted to a vessel owned by a citizen sailing with a *sea-letter*. The passport authorized by a former statute is precisely the same with the sea-letter or passport of the treaties. If, then, by the term sea-letter in this statute is intended the sea-letter or passport of the treaty, the provision is superfluous and idle, because it provides for what already exists; and changing the terms to the construction insisted on by the defendants, the statute would read thus: "that every unregistered ship sailing with a sea-letter, and owned by a citizen of the *United States*, shall be furnished with a sea-letter," that is, provided with what it already possessed. The only way to escape from this absurdity is to adopt the *certificate of ownership* as the true and legitimate *sea-letter*. But this is not all. Another statute was passed on the 14th day of *April*, 1802, where the word *sea-letter* is used precisely in the sense now contended for. This statute declares, that "the second section of the act to retain a further sum or drawback, for the expenses incident to the allowance [*]and payment thereof and in lieu of stamp duties on debentures," shall not be deemed to operate on unregistered ships or vessels, owned by the citizens of the *United States* at the time of passing the said act in those cases, where such ship or vessel, at that time, possessed a *sea-letter*, or other regular document, issued from a custom house of the *United States*, proving such a ship or vessel to be *American* property. This provision is intended to

[* 548]

operate in favour of unregistered vessels, owned by citizens. And the term *sea-letter* is used as synonymous with a regular document issued by a custom house of the *United States* to certificated vessels.

I consider, therefore, the term *sea-letter*, although variously understood on former occasions, yet, as now adopted, naturalized, and legitimated in our statute book, and its meaning perfectly defined, in the sense contended for by the plaintiffs. Though mentioned in certain treaties as synonymous with transports, yet by statutes subsequently created, the term passport is exclusively used, and the word sea-letter transferred and attached to a different idea. The court ought, therefore, to have decided, that the legal, technical *sea-letter*, contemplated by the supreme legislature, and spoken of in our statutes, was the *certificate of ownership*, granted to unregistered vessels belonging to citizens of the *United States*.

If this view of the subject be well founded, the second head of inquiry, whether the court ought to have admitted *parol* evidence to explain the written instrument, need not be considered. If, however, there was any doubt or obscurity on this subject, *parol* testimony ought to have been introduced in order to explain it. In this case, stating the controversy in the most favourable light for the defendants, there were two instruments, one legalized by treaty, and the other by statute, of the same denomination: two distinct ideas were attached to the same term. This, therefore, is as much a *latent* ambiguity as the case commonly[*] cited of two individuals bearing the same name. The only mode to arrive at truth, to reach the meaning of the parties, was to have admitted *parol* explanations of the understanding of merchants and insurers. A warranty, says a celebrated writer on insurance, (*Marshall*, 249.) like every other part of the contract, is to be construed according to the understanding of merchants, and does not bind the insured beyond the com-

IN ERROR.

ALBANY,
Feb. 1807.

Sleght
v.
Hartshorne
and others.

[* 549]

mercial import of the words. If the legal import of *sea-letter* was ambiguous, its commercial meaning, applied to the contract, would have dispelled every shade of doubt.

In every view of the subject, therefore, I am of opinion, that the judgment of the supreme court ought to be reversed.

A majority of the court concurring in this opinion, it was, thereupon, ORDERED and ADJUDGED, that the judgment given by the supreme court be, and the same is hereby reversed, there being error in the decision of that court, in determining, that the paper writing, offered by the plaintiff in error, on the trial, was not a *sea-letter*, and that a *venire facias de novo* be awarded.

Judgment reversed.