GERNON (CRANMER v.). See Case No. 3,-359.

GERRITY (FOGARTY v.). See Case No. 4,-895.

========

## Case No. 5,369.

### The GERTRUDE.

[Blatchf. Pr. Cas. 374.] 1

District Court, S. D. New York. July, 1863.

PRIZE—BLOCKADE—FALSE PAPERS.

Vessel and cargo condemned for an attempt to violate the blockade, and because of false papers as to their destination, and because the cargo was partly contraband of war, on transportation to a port of the enemy.

[Cited in The Stephen Hart, Case No. 13,-364; The Springbok, Id. 13,264, 5 Wall. (72 U. S.) 20.]

In admiralty.

========

## Case No. 5,370.

### The GERTRUDE.

[3 Story, 68; 2 Ware (Dav. 176) 181; 4 Law Rep. 444.] 1

District Court, D. Maine. Dec. Term, 1841.

Circuit Court, D. Maine. May Term, 1844.

CUSTOMS DUTIES — PROPERTY SUBJECT TO DUTY—TACKLE, APPAREL AND FURNITURE OF WRECKED VESSEL—GOODS LANDED FROM SUCH VESSEL.

1. The tackle, apparel and furniture of a foreign vessel wrecked upon our shore, and landed and sold separate from the hull are not goods, wares and merchandise imported into the United States within the meaning of the revenue laws.

[Cited in M'Lean v. Hager, 31 Fed. 606; The Conqueror, 49 Fed. 105.]

2. Goods taken and landed from a foreign vessel wrecked upon the coast are not subjected to forfeiture under the 50th section of the act of March 2, 1799, c. 128 [1 Story, Laws, 617; 1 Stat. 665, c. 22], by being landed without a permit from the collector.

[Cited in The Ex Lady Essex, 39 Fed. 767.]

This was an appeal from the decree of the district court for the district of Maine. The original proceedings in the district court are fully presented in the following statement of facts and in the opinion of the district judge. This was a libel for a forfeiture founded on the 50th section of the collection act of 1799,

1 [Reported by Samuel Blatchford, Esq.]

1 [Reported by William W. Story, Esq. 4 Law Rep. 444, contains only a partial report.]

c. 128 [1 Stat. 665, c. 22]. The libel alleged, that on the 1st of January, 1840, certain goods, wares and merchandise of the value of $400, brought from a foreign port, were unladen from the brig Gertrude [William F. Andrews, claimant] without a permit therefor having been first obtained from the collector of the port, against the form of the statute, whereby said brig became forfeited to the United States. It appeared from the evidence, that she was a British brig, and that on the 9th of December, 1840, she was driven on shore in a storm, and wrecked on the north side of West Quoddy Head. On the application of the master, surveyors were appointed by Solomon Thayer, a notary public, to examine the vessel, who after visiting and examining her, reported her to be a wreck, and in consideration of her exposed situation and the danger that she would go to pieces in the event of another storm, advised that she should be sold the next day where she lay, and she was sold accordingly. The day following the sale she was got off the rocks and towed into the harbor of Eastport. She had at the time no cargo on board, but her cables, anchors and rigging appear to have been taken on shore while she lay on the rocks at Quoddy Head, and before she was carried to Eastport, and this was the unlading, which was relied upon as involving a forfeiture of the vessel.

Holmes, Dist. Atty., for the United States. C. S. and E. H. Daveis, for claimant.

WARE, District Judge. The single question in issue, between the parties in this case, is whether there has been a forfeiture by unlading goods, wares and merchandise from the brig Gertrude, of the value of $400, without a permit having been first obtained therefor from the collector of the district, within which they were landed. The argument has indeed taken a somewhat wider range, but the judgment of the court must follow the allegata et probata, and be confined to the matters that have been put in issue by the parties in their pleadings, and which are made out by the proofs. By the act of congress, March 2, 1799, c. 128, § 50 [1 Stat. 665, c. 22], under which the forfeiture is claimed, it is provided, that no goods, wares or merchandise, brought in any ship or vessel from any foreign port or place, shall be unladen from such ship or vessel within the United States without a permit from the collector of the port, or the naval officer, if there be one; and, if they are unladen contrary to the act, the master and all other persons knowingly concerned in aiding in the unlading or delivering are subjected to a penalty of $400; and when the goods so unladen shall amount to $400 in value, the ship herself with her tackle, apparel and furniture, shall be subject to forfeiture. There is no direct evidence that any thing was unladen from the vessel, and it is conceded that she had no

cargo on board. But it appears when she went ashore, that she had on board two anchors and two chain cables, and certain other furniture and rigging employed in the navigation of the vessel, which were not on board when she was brought into Eastport. As no account is given of them by the claimant, it must be presumed that they were landed while she was lying on the shore near West Quoddy Head. If it were otherwise, it would be easy for the claimant to show it. It is also clear from the evidence, that the value of the rigging, of which the vessel had been stripped, including the cables and anchors, was more than $400.

Upon these facts two questions have been raised and argued at the bar. First, whether the tackle, apparel and furniture of a vessel thus cast on shore a wreck, which have been actually used or have been specially destined for the use of the vessel in navigating her, are goods, wares and merchandise imported into the United States within the true intent and meaning of the revenue laws. At the first blush, this question would seem to admit a very easy answer. The rigging and apparel of a ship are a part of the ship, and therefore not merchandise in any other sense of the word than that in which the ship herself is. But it is said, that when the ship is wrecked and the rigging separated from the hull, it becomes merchandise in the ordinary sense of the word. It is sold as such, and becomes mixed in the general mass of consumable commodities in the country. When thus separated with the intention of being thrown into the market and sold, as these articles take the place of others of the same character, which are regularly imported, the argument is, that there is the same reason for charging them with duties as there would be if they were imported as cargo, and of course subjecting them to all the restraints and safeguards imposed by the revenue laws upon regular importations. All this may be admitted to be true, and the question will still return, whether this has been done by the legislature. However just and reasonable it may be, that goods thus introduced into the country, and sold for common use and consumption, should be subject to duties, it is quite clear that the court has no authority to impose the tax. Our duty is limited to the inquiry whether it has been imposed by the legislature.

If we look through the whole of the numerous acts of congress laying duites on merchandise imported, as well as those regulating the collection of the same, we shall find they uniformly contemplate the cargo; they refer to articles having the quality of merchandise in the ordinary and most popular sense of the word. They refer also to goods intended to be introduced into the country for sale and consumption, or for the general purposes of commerce. Although they speak generally of goods imported or

brought into the United States, it has been uniformly held that, to constitute an importation within the true meaning and intent of these laws, the arrival must be voluntary, with the intent to import them. If therefore a vessel not bound to the United States is by stress of weather forced into our ports, this will not constitute an importation, upon which the right to duties will attach. This, as the authorities cited at the argument abundantly prove, has been the uniform construction given to the revenue laws. The Mary [Case No. 9,183]; U. S. v. Vowell, 5 Cranch [9 U. S.] 368; U. S. v. Arnold [Case No. 14,469]; Prince v. U. S. [Id. 11,425]; Perots v. U. S. [Id. 10,993]; Peish v. Ware, 4 Cranch [8 U. S.] 347. A like construction has been given to the navigation laws of England (Reeves, Shipp. 203); and probably the same rule prevails in every civilized community. It can only be a people, who have made but little progress in civilization, that would not permit foreign vessels in distress, to seek safety in their ports, except under the charge of paying import duties on their cargoes, or under penalty of confiscation, if they were prohibited goods, which would be the consequence of applying to such cases the rigor of the fiscal laws. Against such a country the unfortunate mariner might justly exclaim,

——"Quae hunc tam barbara morem
Permittit patria? hospitio prohibemur arenae."

To hold then the rigging of a vessel cast by misfortune a wreck on our shores to be goods, wares and merchandise imported into the United States, would be extending the operation of the revenue laws beyond what their natural and obvious meaning requires. The fiscal laws of the country, which furnish the means by which the whole machinery of the government is sustained, although they impose burthens on individuals, are not to receive the strict and narrow construction, that is given to penal laws. Neither are they, like remedial laws, to be enlarged by construction, so as to include cases, which seem to stand on the same reason with others, which are within the express words and the plain intention of the law, if it is not apparent that they were intended to be included by the legislature. They are to be applied according to their plain, natural and obvious meaning, regarding as well the general tenor as the particular words of the law; as comprehending all cases, which, from the general scope of the law, appear to have been intended and contemplated by the legislature; and neither to be extended by analogy, nor restrained by a strict construction, from the notion that they belong to the class of penal laws, because they impose burthens on individuals as a condition of their being allowed the free disposition of their property. Sullivan v. Winthrop [Case No. 13,600].

The revenue laws in all cases contemplate a ship as a single object, and when it is

subjected to any fiscal charge, it is imposed under the name of a tonnage duty. The rigging, furniture and appurtenances are a part of the ship. See the case of U. S. v. Chain Cable [Id. 14,776]; the very question was presented whether a chain cable, which had been purchased in a foreign country for the use of the vessel, was embraced by the revenue laws, under the terms "goods, wares and merchandise," which could not be landed without a permit. The court held, that it was not. If this vessel had gone to pieces on the rocks, so that there had been nothing but fragments remaining, it would hardly be pretended that the broken yards, the torn sails and damaged cordage, with the fragments of the hull, would come within the descriptive words of goods, wares and merchandise imported, and liable to duty, or that it would be necessary for the master under penalty of confiscation of the wreck to obtain a permit from the collector before he could collect the disjecta membra on the shore. And yet in what discriminative features would that case differ from the present? It might be said of every part of these fragments, that they were goods, wares and merchandise brought into the United States from a foreign country, with the same reason as it is said of the rigging in this case. My opinion is, that the materials and rigging of a foregn vessel cast upon our shore as a wreck, when landed and sold do not come within the purview of the revenue laws as merchandise imported.

But if this opinion is erroneous, then the second question which has been argued will arise, whether in this case a forfeiture of the vessel has been incurred by landing the goods without a permit. It is not to be readily supposed, that a provision so highly penal, as this section of the law is, was intended to be applied to a class of cases, in which a compliance with its terms would in some instances be impossible, and in all involve the most imminent danger of the entire loss of the property. When a vessel is thrown upon the coast a wreck, the cargo must be saved by such means as are practicable, or not saved at all. If the master, before taking measures for placing it beyond the reach of the waves, must wait until he can obtain a permit of the collector for that purpose, whose residence may be a day's journey from his vessel, it is very evident, that in many cases the entire cargo would be swallowed up by the waves before the permit could be obtained. To require a compliance with this section of the law in such cases would be nearly equivalent to the revival of the old and barbarous custom, by which all wrecked goods were confiscated. Such a construction of the law is wholly inadmissible, if it will admit of any other. Now if we look at this section in connexion with the whole tenor of the law, it is evident that the legislature contemplated only cases of vessels, which had arrived in safety

item

at the regular port of their destination, and certainly did not contemplate cases where a compliance with the law would be impracticable. Upon the common principles therefore of construing statutes, the words of this section must be so interpreted as to carry into effect the general intent of the lawgiver, neither to defeat it, nor to extend it to cases clearly beyond the purview of the law. But this can hardly be considered as an open question. It was, as it seems to me, conclusively settled in the case of Peish v. Ware, 4 Cranch [8 U. S.] 347, more than thirty years ago. For though in that case there was no allegation in the libel founded on this section of the law, there was one founded on the 51st section, and in deciding it, the court thought necessary to give a construction to the 50th. In that case, the goods were landed from a wreck without a permit, and it was held that, upon just legal construction, the landing of the goods did not subject them to forfeiture under the 50th section. The act of landing in such a case, the court said, is not within the law, which is calculated for cases in which the general requisitions of the law can be complied with, and not for salvage goods in cases where they cannot be.

Upon the whole, the conclusion to which I am brought is, first, that the tackle, apparel and furniture of a foreign vessel wrecked upon our shore, and landed and sold separate from the hull, are not goods, wares and merchandise imported into the United States, within the meaning of the revenue laws. And in the second place, if they are to be so considered, that they are not subject to forfeiture under the 50th section of the act of March 2, 1799, c. 128 [c. 22,] by being landed without a permit from the collector. At the same time, it may not be improper to remark, that there is something of mystery hanging over this case. The evidence before the court is sufficient to raise the questions, which have been considered, and yet it is pretty clear, that the whole evidence which it was in the power of the parties to produce, has not been before the court. It is a little singular, that the informer in this case is the purchaser of the vessel at the sale that was made in conformity with the recommendation of the surveyors; that he does not insist upon his title, and that the claimant now resisting the forfeiture is the original British owner. What might be the result if every fact in the power of the parties to prove was spread upon the record, is not for me to say. I can act only upon the allegations that are made and the facts that are proved, and on them my opinion is, that the law requires me to pronounce, for the restoration of the vessel, but I shall grant a certificate of probable cause of seizure.

From the decree an appeal was taken to the circuit court on behalf of the United States.

G. Parks, for the United States.
Charles L. and E. K. Daveis, for defendant.

STORY, Circuit Justice. I have examined the record and the opinion of the learned judge of the district court delivered in the present case. I fully concur in that opinion, and have no desire to add any thing to his reasoning, which is so cogent and so satisfactory; or to amplify the authorities which he has so diligently consulted and commented on. My judgment is, that the decree of the district court ought to be affirmed.