## THE CONQUEROR.[1]

### VANDERBILT *v.* THE CONQUEROR *et al.*

*(District Court, S. D. New York. January 28, 1892.)*

1. CUSTOMS DUTIES—FOREIGN BUILT YACHT—IMPORTED ARTICLE—SHIPPING LAWS.
    From the foundation of the government the duties on ships and vessels have been regulated by acts independent of the custom laws, and under a different system of legislation. Nor are vessels mentioned by name in any of the schedules or paragraphs prescribing duties. Accordingly, when the foreign built yacht Conqueror was purchased abroad by an American citizen, and navigated to the port of New York, and was then seized by the collector of customs, on the claim that she was liable to duties as an imported article, under the general tariff act of October 1, 1890, (26 St. at Large, p. 567,) and her owner thereupon brought this suit to recover possession of her, it was *held* that the yacht was not an imported article, in the sense of the tariff law, and not subject to duties under the tariff act of October 1, 1890.

2. SAME—PRACTICE—COLLECTOR'S POSSESSION—SEIZURE BY MARSHAL.
    Under section 931 of the Revised Statutes, where the collector's agent in possession of the *res* denies the authority of the court, the court will order the marshal to take exclusive possession of the subject of the suit.

In Admiralty. Suit by the owner to recover possession of the yacht Conqueror, held by the collector of customs for non-payment of duties. See 12 Sup. Ct. Rep. 295.

[1] Reported by Edward G. Benedict, Esq., of the New York bar.

*Elihu Root* and *Samuel B. Clarke*, for libelant.

*Edward Mitchell*, U. S. Dist. Atty., and *Henry C. Platt*, Asst. U. S. Dist. Atty., for respondent.

BROWN, District Judge.   On September 1, 1891, the libelant brought the above possessory action against J. Sloat Fassett, collector at this port, to recover possession of his yacht, the Conqueror, which the collector had taken and held in his custody on the claim that she was subject to customs duties.   The authority of the court to proceed in the matter being denied, the marshal, under an *alias* process, and the explicit order of the court, under its general powers and section 934, Rev. St., took the yacht out of the possession of the officers of customs into his exclusive custody; and thereafter, on the 19th of October, 1891, upon the application of Fassett to the supreme court, an order was obtained, requiring this court to show cause why a writ of prohibition should not issue, forbidding this court from further entertaining the cause.   On the hearing of that order, the question both of the jurisdiction of this court and whether the yacht was dutiable under the customs laws was fully argued. The supreme court denied the writ of prohibition, on the ground that this court had lawful jurisdiction both of the parties and of the subject-matter, without considering whether the yacht was liable to duty as an imported article.   The proofs since taken sustain the main facts stated in the libel and the answer.   The defendant claims no other right to the custody of the yacht than for the collection of customs duties. The proofs show that Mr. Vanderbilt, a native born citizen of the United States, and a member of the Royal Mersey Yacht Club of England, purchased the yacht in England on May 7, 1891, of W. S. Bailey, the registered owner of the yacht, by a bill of sale in the usual form; that, after cruising in the waters of Great Britain and Norway, the yacht was navigated by her master to Halifax, and thence to the United States, arriving at the port of New York on or about July 6, 1891; that on arrival here the yacht was entered at the custom-house, the bill of sale, previously certified by the American consul at Liverpool, being presented to the collector for record and certification; and that the collector's certificate was indorsed thereon, in accordance with articles 93 to 97 of the treasury regulations of 1884, entitling the yacht to the protection and flag of the United States, but not entitling her to engage in commerce, (Rev. St. § 2497;) that the collector claimed that the yacht was subject to customs duties as an imported article, and that, such duties not being paid, he, on the 27th of August, 1891, by his deputies, took possession of and held her for the payment of such duties, until she was arrested by the marshal, as above stated.

The libel being filed to recover possession of a vessel alleged to be wrongfully detained, it is immaterial whether at the moment of the filing of the libel, or of the issuing of the original process, the yacht was within the territorial limits of this jurisdiction, or in the waters of the adjoining district; for she presently came within the territorial jurisdiction of the court, and was there lawfully and regularly arrested

under the process. The process was not void merely because when issued the yacht was across the boundary line of this district. The supreme court, having all the facts upon the record before it, has expressly affirmed the jurisdiction of the court over both the vessel and the parties, and its authority to proceed with the cause.

The only remaining question is whether the yacht is subject to customs duties. If she is not, the seizure and possession by the collector were illegal, and it is the duty of the court to give the libelant judgment and a writ of possession.

The history of legislation in this country in reference to ships and vessels, as shown by scores of acts in the United States Statutes at Large, leaves no doubt, as it seems to me, that from the beginning ships and vessels have been treated as a subject *sui generis*, and that the acts of congress in regard to them form a complete system by itself, wholly outside of ordinary tariff legislation as respects imported goods, wares, and merchandise. Duties on vessels have always been imposed, but never in those acts, or in the same sections of acts, that deal with customs duties on goods, wares, and merchandise. They have always been imposed either by independent acts, or by independent sections in the same act, and by different methods from those applicable to merchandise, viz., duties computed by tonnage. Protection to American industries also, and the development of American commerce and of the American marine, so sedulously studied from the first, have been provided for in ways altogether peculiar to ships and vessels alone; not merely by exacting higher duties on foreign built vessels than upon domestic ones, but higher duties also upon the cargoes brought in foreign bottoms, (still the law, except where exempted by special treaty stipulation;) and, finally, by excluding foreign vessels altogether from American registry; so that no foreign built ship can become a vessel of the United States except by a special act of congress, or take part in the coasting or internal trade of the country. Not a decade has passed since the foundation of the government during which one or more, often several, changes have not been made in the regulation of the duties to be paid by foreign and domestic vessels, and in the discriminations affecting the vessels of particular countries. These acts are much more numerous than the tariff acts, and show the constant presence of the subject in the mind of congress. In view of such a body of legislation, evidently forming a system by itself, and covering the subject of duties to be paid to the government by foreign or domestic vessels coming to this country in the usual course of navigation, and presumptively, therefore, embodying the whole intention of congress in reference thereto, the usual rule in the construction of statutes would exclude ships and vessels from the purview of ordinary tariff legislation as regards imports of goods, wares, and merchandise, in the absence of any provisions showing a clear intention to include ships and vessels, and thus to impose on them a double duty. Examination of all the tariff acts, including that of October 1, 1890, shows that in not one of them are ships or vessels named in the schedules of imports; nor is there a single phrase under which they can be classed, except by a strained and unnatural construction. By the rule

of construction above referred to, therefore, and without reference to the practice of the government for more than a century not to treat vessels coming here in the usual course of navigation as subject to tariff duties on imports, all such vessels should be held subject to such duties only as are imposed under the special acts dealing with ships and vessels, and not subject to the acts dealing only with duties on imported merchandise.

While the foregoing general view seems to me quite sufficient for the decision of the cause, the novelty of the subject makes proper, perhaps, a consideration of it more in detail. Duties upon the yacht are claimed to be due under the customs act of October 1, 1890, (26 St. at Large, p. 567.) That act declares in its first paragraph that "there shall be levied, collected, and paid upon all articles imported from foreign countries, and mentioned in the schedules herein contained, the rates of duty by the schedules prescribed." To come within the act the article must be (1) imported; (2) mentioned in the schedules; and (3) fall within the general scope and intention of this act, rather than within those other acts that provide specially for duties upon ships and vessels. Neither of these conditions seem to me to exist as regards such a vessel as the Conqueror. She is a sea-going, schooner-rigged, screw steam-ship, 182½ feet long, nearly 25 feet wide, and 13½ feet deep. Her measurement is about 372 tons gross, 219 1-5 tons net. Her crew consists of 25 men She came to this country in the ordinary course of navigation, as a pleasure yacht, duly entered at the custom-house, and presented the bill of sale, in conformity with the treasury regulations applicable to foreign built vessels purchased by citizens of this country, as above stated. She paid no tonnage duty, because section 4216 of the Revised Statutes abolished that duty upon yachts belonging to a regularly organized yacht club of a foreign nation which extended similar privileges to yachts of this country.

1. A vessel arriving in this way is not, in my judgment, an "imported article," within the meaning of the tariff law. The word "imported" has, in general, the same meaning in the tariff laws that its etymology shows,—*in porto*, to bear; to carry. To "import" is to bear or carry into. An "imported" article is an article brought or carried into this country from abroad. This yacht was not borne or carried into this country. Vessels are the means or instruments of importation. They are not ordinarily themselves imported. The definition of a "vessel" in section 3 of the Revised Statutes is, "every description of water-craft * * * capable of being used as a means of transportation on water." A vessel arriving in the ordinary course of navigation is no more "imported," in the ordinary sense of that word, than she is "transported." Occasionally small crafts are carried from one country to another on board of larger vessels. When thus transported from one country to another, they are imported, and so far may be subject to duties as imports. The present is no such case.

2. Ships and vessels are not "mentioned" by name in any of the schedules or paragraphs prescribing duties. The only paragraphs under which it is claimed they might be brought are paragraph 215, as "man-

ufactures of iron or steel, \* \* \* whether partly or wholly manufactured;" paragraph 230, as "manufactures of wood;" paragraph 137, as "beams, posts, building forms, etc., together with all other structural shapes of iron or steel, whether plain or punched, or fitted for use;" paragraph 153, "anchors, or parts thereof, of iron or steel, wrought-iron for ships, forgings of iron or steel for vessels or parts thereof;" and section 4 of the act, as "articles manufactured in whole or in part, not provided for in this act." Paragraphs 137 and 153 plainly enough refer to the articles in their separate forms; not when found built into, or forming a part of, such a structure as a vessel, which must be treated as a unit. Paragraphs 215 and 230 and section 4 relate only to articles "manufactured." The first imposes a duty of 45 per cent. *ad valorem*, the second 35 per cent., and the third 20 per cent. *ad valorem*. The mere etymology of the word "manufactured,"—that is, something made by hand,—might admit of its application to a ship; and in the case of a vessel, though completed, brought into port on board of another vessel, as merchandise, and not properly falling within the provisions or the intention of the special acts imposing duties on ships and vessels, I am not prepared to say that the description of it as a "manufactured" article under some of those general clauses, though it may be difficult to say which, might not be sufficient to render it chargeable with duties as an import "mentioned" in the tariff act, as in the case of *The Madge*, Treas. Dec. 4960, (March 17, 1882.) But in the ordinary use of language a vessel is no more "manufactured" than a house or a cathedral. Ships are "built" or "constructed," and those who build them are known as "ship-builders," not as "ship-manufacturers." Considering the fact that hundreds of objects are specifically named in the tariff acts, many of them of but slight consequence in comparison with ships and vessels; and considering the prominence of ships and vessels as the chief means of all importation, that they are so often presented to the attention of congress, and that there is not a tariff act but contains some allusion to them,—it is not credible that if it had been the intent of congress to make sea-going vessels coming to this country in the usual course of navigation subject either to specific or *ad valorem* duties, they would not have been mentioned *eo nomine* in some of the tariff schedules, and not left to be covered by such remote and far-fetched clauses as "manufactures of iron or wood," or "manufactures not otherwise provided for." The absence of apt words affords a strong presumption that vessels coming here in the usual way are not included.

3. The controlling fact, however, which accounts at once for the absence of ships and vessels from the express provisions of the tariff acts, and for the lack of any apt words in those acts to include them, is the fact first above mentioned, viz., that from the foundation of the government the duties on ships and vessels have been regulated by acts independent of the customs laws, and under a different system of legislation. From the first, duties on imports and duties on ships and vessels have been always treated as separate and independent subjects. The first act of the first congress was for its own organization. The second was an

act laying a duty on "goods, wares, and merchandise imported." (1 St. at Large, c. 2, p. 24.) The very next act, passed July 20, 1789, (1 St. at Large, c. 3, p. 27,) provided for duties on ships and vessels. It enacted that "the following duties shall be and are hereby imposed on all ships or vessels entered in the United States;" imposing different rates of duty per ton, viz.: (1) On those built and owned here, six cents per ton; (2) on those built here, but belonging wholly or in part to foreigners, 30 cents per ton; and (3) on all other vessels, *i. e.*, those built abroad, 50 cents per ton. This distinction between ships and vessels dutiable at certain rates per ton, and goods, wares, and merchandise imported, and dutiable at specific or *ad valorem* rates, has continued to the present hour, and has been recognized in scores of acts. The Revised Statutes (section 4219) enact that, "upon vessels entered in the United States from any foreign port, there shall be paid duties as follows," specifying various different rates per ton. Section 4223 provided that "the tonnage duty imposed on all vessels engaged in foreign commerce shall be levied once a year. By the act of June 19, 1886, (24 St. at Large, p. 82, § 11,) "a duty of six cents per ton, not to exceed 30 cents per ton per annum," was "imposed at each entry upon all vessels entered from any foreign ports; not, however, to include vessels in distress, or not engaged in trade." In the numerous statutes which have regulated the changes in the rate of tonnage duty, and the distinctions made between domestic and foreign built vessels, these duties are sometimes spoken of simply as "duties on ships and vessels," as in the first act; sometimes as "duties on the tonnage of ships," or as "tonnage duties on ships," or as a "tonnage tax." The various expressions all signify the same thing. All are "duties," imposed as directly upon ships as the tariff duties are imposed upon merchandise. The two classes of subject are wholly distinct. The tonnage duty is the duty provided to be paid by ships; the tariff duty, by imported merchandise. Each class is governed by its own laws, and neither is designed to pay a double tax. The reason for the distinction is obvious. Vessels are destined to come and go continually; merchandise, to be consumed on shore. Merchandise, therefore, pays duty on its value but once, and once for all. If vessels were dutiable, under the same law, on their whole value at every entry into port, they would be speedily taxed out of existence, and navigation would become insupportable. Vessels, therefore, are taxable at a much lower rate, but payable at every entry, or yearly.

There is nothing in the act of 1890, so far as regards the question under consideration, that in any way distinguishes it from prior tariff acts. The words "articles imported," used in the act of 1890, have been used in several previous acts, and those words have no more extended meaning than the word "merchandise" in the earlier acts, since the word "merchandise" includes "chattels of every description capable of being imported." Rev. St. § 2766. The revenue act of July 14, 1862, (12 St. at Large, p. 543,) well illustrates the above views. That act in its first 14 sections imposed duties on imported merchandise, etc. It provided also (Id. p. 557) for duties on manufactures in substantially

the same terms as paragraph 215, and § 4, Act 1890. The next section imposed duties on ships and vessels as follows:

"Sec. 15. Be it further enacted that upon all ships, vessels, or steamers which shall be entered in any custom-house in the United States from any foreign port or place, whether ships or vessels of the United States, or belonging wholly or in part to subjects of foreign powers, there shall be paid a tax or tonnage duty of 10 cents per ton, * * * in addition to any tonnage duty now imposed by law."

Here are the two classes of subjects, viz., "imported merchandise" as one group, and "ships and vessels" as the other, brought side by side in the same act. The different duties and the different modes of imposing them on the two classes are clearly discriminated. No one would seriously contend that vessels liable to a tonnage duty under section 15 of that act could be liable as an imported article to an additional duty, under such general words in the prior sections as "manufactures of iron" or "manufactures not otherwise provided for." The manifest intent of congress to provide independently in section 15 for the duties to be paid by ships and vessels excludes the prior sections from any application to whatever is covered by the latter. Similar provisions in the act of 1890 cannot receive any different construction.

In the case of U. S. v. A Chain Cable, 2 Sum. 362, where a chain cable had been bought in Liverpool by the master of an American vessel to replace an old one worn out, and was landed in Boston without a permit, and claimed to have become thereby forfeited, Mr. Justice STORY held that the article, though brought in on board the ship, and so imported, was nevertheless to be treated as a part of the ship, and not as goods, wares, or merchandise, within the meaning of the general revenue laws. So in The Gertrude, 3 Story, 68, Mr. Justice STORY, affirming the decision of WARE, J., held that the "tackle, apparel, and furniture of a foreign vessel wrecked upon our shores did not come within the meaning of the revenue laws as imported merchandise." But for the acts of June 29, 1870, (Rev. St. § 4216,) and of June 19, 1886, (24 St. at Large, p. 82, § 11,) there can be no question that this yacht would have been required to pay tonnage duties like all other vessels coming from a foreign port. She is plainly within the special statutes relating to duties on ships and vessels, and is therefore not within the scope of the general tariff upon imported merchandise. By the acts of 1870 and 1886, above referred to, congress has exempted such yachts, not engaged in trade, from the payment of tonnage duties. The effect of this was not in any degree to extend the scope of the tariff act concerning imports, so as to make it applicable where it was not applicable before. The plain intent of congress was to relieve such yachts from the prior burden of tonnage duty; not to increase their burdens, or to add any new ones. The reasons for it, if I am rightly informed, were for the improvement of navigation, by the development of the finest models both for speed and in the various forms of naval architecture, for free intercommunication between yachtsmen of different countries, their invitation to our shores, and the advantages to our own yacht-builders likely to result therefrom.

4. It is urged, however, that, though foreign vessels entering at our ports may not in general be subject to duty as imports, the case of the Conquerer is distinguishable from them in two respects: (1) That the former are treated by international comity as a part of the territory of the country to which they belong, and, being here only temporarily, are by comity not considered as imports; (2) that the Conqueror presented her bill of sale at the custom-house, and obtained the certificate of the collector thereon, entitling her to the protection and flag of the United States, and that this act made her an import by change of domicile, and subject, therefore, to import duties.

If, however, the views previously expressed are correct, none of these suggestions have weight. They do not change the fact that the yacht was navigated to this port as a sea-going vessel, and hence liable to duty. if at all, under the shipping laws, and not under the laws applicable to imported merchandise. The circumstances stated do not widen the scope of the tariff law, nor change the class to which the yacht belongs, nor transfer her from the one system of legislation to the other. After the bill of sale was made, she was none the less governed by the shipping laws alone; and, but for the acts of 1870 and 1886, she would have remained subject to tonnage duties precisely as before, whether the bill of sale was presented and certified at once, or not till long afterwards. The certification has not the effect ascribed to it. It contributed nothing to give the yacht an American domicile, or to make her American property. She was made American property months before by the bill of sale, and her domicile followed that of her owner. The certification did not make her a "vessel of the United States," nor give her the general rights or privileges of vessels of the United States. *The Merritt*, 17 Wall. 582. She could not enter into the foreign trade, nor into the internal or coastwise trade of the country. Sections 2497, 4131, 4311. The only use of the certification was to serve as "proof of American ownership," for her convenience in navigation as a pleasure yacht, and to absolve her from the payment of light-money." Rev. St. §§ 4225, 4226; *The Miranda*, 47 Fed. Rep. 815; *Sleght* v. *Hartshorne*, 2 Johns. 531, 545. She had already once before entered this port under the libelant's ownership, and paid "light-money," not having certified papers. If she was not liable to import duties before the certification, when navigated by the libelant as owner, there is nothing in the tariff act, or in section 4226, that makes the payment of import duties either a condition or a consequence of such certification; and without that there can be no additional duties imposed.

As regards the other suggestion, it is not correct to say that foreign private ships are usually treated as parts of the territory of the country to which they belong. It is only public vessels that are entitled to that exemption. As to private foreign vessels, the contrary is the rule. They are subject to all the laws and regulations enacted in regard to them by the country which they enter. It is under such laws that foreign vessels are required to pay tonnage duties, pilotage fees, and light-money. That import duties are not exacted of such vessels is not because of any legal fiction or international comity, but because they are not within

the scope of the tariff laws on imports, and are dutiable according to the shipping laws alone. Had foreign vessels been within the scope of the tariff law on imports, it is certain that the government would not have foreborne for a century past to collect import duties on such vessels, either by reason of their temporary stay, or of any notions of international comity.

In my judgment, nothing in the case removes this yacht from the domain of the laws specially enacted for ships and vessels, as to the dutiable charges thereon; and as by these laws she is released from the payment of the duties ordinarily imposed on vessels, without being charged with any other duties, or made subject to the general tariff law on imported merchandise, her detention for customs duties was illegal, and the libelant is entitled to a decree for possession, with costs and damages.