## UNITED STATES v. 1,150½ POUNDS OF CELLULOID.

### (Circuit Court of Appeals, Sixth Circuit. October 11, 1897.)

### No. 470.

1. CUSTOMS LAWS—FORFEITURES FOR FRAUDULENT ENTRIES—INTENT.

In order to enforce a forfeiture under the customs administrative act of June 10, 1890 (section 9), it is necessary that the acts made a ground of forfeiture shall be done by the owner, or some one for whom he is responsible, or under whom he derives title; and goods will not be forfeited which are unlawfully brought into this country by a mere trespasser, without the knowledge of the owner or his agent, and with intent to himself appropriate the money provided by the owner for the payment of the lawful duties.

2. SAME—CONSTRUCTION OF STATUTE.

The customs administrative act of June 10, 1890, provides, in section 9, "that if any owner, importer, consignee, agent or other person" shall make or attempt to make a fraudulent entry of goods such goods shall be forfeited, etc. *Held*, that the words "or other person" mean some one of the same general class as those described by the preceding words, and hence do not include a stranger who is a mere trespasser in respect to the goods.

In Error to the District Court of the United States for the Eastern District of Michigan.

This is a proceeding for the forfeiture, under section 9 of the customs administrative act of June 10, 1890, of 1,150½ pounds of celluloid, on the ground that it was smuggled into the United States by means of a false and fraudulent invoice. The claimant and owner of the celluloid, which has been seized as forfeited, is the Water Lily Kollar & Kuff Company, a corporation of the state of Michigan, doing business in Detroit, Mich. The claimant, by answer, denied all complicity in, or knowledge of, the fraudulent device by which this celluloid had been smuggled into the United States. The issues between the government and the claimant were submitted upon the evidence to the Honorable Henry H. Swan, judge of the district court of the United States for the Eastern district of Michigan, who made the following finding of facts:

"The United States government seized 1,150½ pounds of celluloid at the port of Detroit on the 18th day of May, A. D. 1892, claiming the same to be forfeited under the revenue laws of the United States. The celluloid seized was the property of the Water Lily Kollar & Kuff Company, a corporation organized under the laws of the state of Michigan, and having its office in the city of Detroit, in said state. The directors of the corporation are reputable business men of the city of Detroit, a majority of the directors being the owners of a large piano and organ manufactory in Detroit, established for upward of thirty years. The Water Lily Kollar & Kuff Company had imported 5,800 pounds of celluloid into Canada from Scotland and France. The celluloid was stored in Windsor, Canada, for the purpose, in part, of supplying the Canadian trade, and for the additional reason that such storage reduced the expenses of the business in Detroit in the matter of fire insurance and customs duties, duty only being paid on select stock and net weight, instead of upon the bulk packages. The storage of the celluloid in Windsor was open and notorious. It was stored with one Joseph H. Elliott in a storage shed upon his premises. Elliott was employed in the organ factory referred to; lived in Windsor, going and returning from his work each day. S. B. Warren was the secretary and manager of the Water Lily Kollar & Kuff Company, and acted, with reference to importations of celluloid, under the direction and control of the board of directors of the corporation. It was the custom in the business of the corporation to import celluloid from the place of storage in Windsor to Detroit in small quantities and selected lots, from time to time, as needed in the Detroit business. The first importation was made by Elliott bringing the celluloid desired across the river to Detroit, being there met by Mr. Warren; they together going to the custom house, and Mr. Warren there paying the lawful duties. Subsequently the celluloid was imported by Elliott alone, when in-

structed so to do by Warren, he being furnished the money with which to pay the duties by Mr. Warren. About 4,000 pounds out of the total 5,800 pounds was imported in this manner; the duties regularly paid thereon. A larger amount had been paid in duties than first appeared by the books of the government, but upon investigation the books of the government showed errors, and the books of the corporation showing payments made were found to be correct. On or about the 15th day of May, A. D. 1892, Elliott made a bargain with one Ellston, a friend of his, living in Detroit, by which Ellston agreed to allow Elliott to store the remainder of the celluloid in his (Ellston's) premises, in Detroit. This was without the knowledge or consent of any of the officers, agents, or employés of the corporation. Elliott then caused about 1,200 pounds of the celluloid to be taken from his storage shed, and concealed in the drawers of his household furniture, caused the household furniture to be packed and placed in a moving van, and on the 18th day of May, 1892, moved the celluloid, concealed in and among a portion of his household effects, to Ellston's house, in Detroit. Mrs. Elliott signed and swore to the invoice, and caused the goods to be entered as household effects, fraudulently concealing the fact that celluloid was contained in the packages. The expense of renting Ellston's premises, the hiring of the moving van, the freight, and other incidentals, were paid by Elliott from his own funds. He obtained $25 from the cashier at the organ factory for this purpose, upon the false statement that he needed the money to pay the expenses of his wife to Toronto to attend the funeral of one of her relatives. Mr. Warren, who was the sole manager of the business of the corporation, was, at the time of this unlawful conduct on the part of Elliott, and had been for several weeks prior thereto, at his home, in Detroit, in attendance upon the sickbed of his wife. She died a few days prior to the seizure of the property. Mr. Warren's attendance at his business during the weeks mentioned was at long intervals, and for brief periods at each visit. No other person in the corporation had any share in the management or direction of its affairs. None of the directors, stockholders, agents, or employés of the corporation had any knowledge of the removal of the celluloid in question from the storage shed. None of the directors, employés, or agents had any knowledge or information of Elliott's arrangement with Ellston. No authority or direction of any kind had been given to Elliott to disturb the celluloid in question in its place of storage, or to bring the same, or any part of it, into the United States. There was no intention on the part of the directors, employés, or agents of the corporation, with the exception of Elliott, to defraud the government. Elliott was an agent at special times only, with limited powers, working under specific instructions. He had no authority to remove a pound of celluloid, excepting when so directed. Special orders were given to him in each instance as to the time and quantity of celluloid to be brought by him. At the time the celluloid was fraudulently entered, he had no right to the possession of the property excepting in its place of storage. He was a trespasser in its possession, endeavoring, for private and personal gain, to avoid the payment of the duties. He stated on several occasions after the seizure that, if he had been successful, he would have made a gain of $800 in the transaction. This sum—$800—is approximately the amount of customs duties for which the property seized would be legally chargeable. He did not report to the corporation, or any of its officers or agents, that he had removed the celluloid, until after its seizure by the government. After its seizure, the property was sold under a stipulation, and the proceeds are now held in lieu thereof. The remainder of the property still on storage in Windsor was regularly entered by the owner, and duty paid. Elliott was indicted for smuggling. Elliott and Warren were also indicted for conspiring together to defraud the revenue. Elliott pleaded guilty in the first case, the government entering a nol. pros., and he being set free. He then appeared as a witness against Mr. Warren, but the jury found Mr. Warren not guilty."

Upon the facts thus found, the proceeds of the seized celluloid were ordered paid over to the claimant. The record has been filed, and error assigned by the United States.

Chas. R. Whitman, for the United States.

Thomas Lette, for defendant.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

LURTON, Circuit Judge (after making the foregoing statement of facts), delivered the opinion of the court.

The facts found by the district court make a case where it is sought to forfeit the goods of an owner as a result of the wrongful conduct of one Elliott, a mere trespasser, who removed the celluloid from its lawful place of storage in another country, with the purpose and intent of defrauding the revenue laws of this country by smuggling them into the United States, to the end that he might himself profit by appropriating the lawful duties thereon when thereafter directed by the owner to make a lawful importation, and intrusted with the money to pay the duties. The owners, by the facts found below, are completely acquitted of all complicity with Elliott, and all knowledge of his purpose or conduct in respect of his fraudulent scheme. It is, nevertheless, insisted that this merchandise is forfeited as a result of the acts and conduct of Elliott, and that the innocence of the owners is no defense. If this celluloid has been forfeited under these circumstances, and as a consequence of the unauthorized acts of a mere trespasser, over whom the owners had no control, it must be the result of some very plain and positive provision of law by which the sins of one are to be visited upon another. Such has not been the spirit of the revenue laws of this country prior to the customs administrative act of June 10, 1890.

In the early case of U. S. v. Cargo of Ship Favorite, 4 Cranch, 347, a forfeiture was sought of certain wine and spirits saved from a wreck, because unaccompanied with such marks and certificates as were required by the collection law of 1799, and because they were removed, after being landed, by strangers to the owners, without the consent of the collector, and before duties were paid. The court held: (1) That merchandise saved from a wreck, and landed, as a necessary means for the preservation of the goods, was not thereby forfeited because found by the collector unaccompanied by the marks and certificates prescribed by the act of 1799. (2) That the removal of these wrecked goods from the place where they were deposited when landed, without a permit from the collector or the payment of duties, did not subject them to forfeiture where such removal was made by strangers to the title, and without the consent or procurement of the owners. Marshall, C. J., on this subject, said:

"That the removal for which the act punishes the owner with a forfeiture of the goods must be made with his consent or connivance, or with that of some person employed or trusted by him. If by private theft or open robbery, without any fault on his part, his property should be invaded while in the custody of the officer of the revenue, the law cannot be understood to punish him with the forfeiture of that property. * * * The court is of opinion that those penalties cannot be so applied in this case, not only because, from the whole tenor of the law, its provisions appear not to be adapted to goods saved from a vessel, under the circumstances in which the Favorite was found, but because, also, the law is not understood to forfeit the property of owners or consignees on account of the misconduct of mere strangers, over whom such owners or consignees could have no control."

In U. S. v. Eighty-Four Boxes of Sugar, 7 Pet. 453, a forfeiture was claimed· of certain boxes of sugar as having been entered as brown sugar, when they should have been entered as white sugar, and subjected to a higher rate of duty. The court said:

"The statute under which these sugars were seized and condemned is a highly penal law, and should, in conformity with the rule on the subject, be construed strictly. If, either through accident or mistake, the sugars were entered by a different denomination from what their quality required, a forfeiture is not incurred."

In Six Hundred and Fifty-One Chests of Tea v. U. S., 1 Paine, 499, Fed. Cas. No. 12,916, it was sought to declare a forfeiture of certain chests of tea because found without the certificates of importation required by section 43 of the collection act of 1799. It appeared that the owners were not at fault, these teas having been removed from a storage warehouse, where they were held under bond, without obtaining proper certificates showing duty paid, by persons not under the control of the owner, and not acting for him, and that the owner was guilty of no fault. Mr. Justice Thompson heard the cause on appeal to the circuit court, and decided against the forfeiture. Among other things, the learned justice said:

"I am not aware of a single instance where, by any positive provision of the revenue laws, a forfeiture is incurred, that it does not grow out of some fraud, mistake, or negligence of the party on whom the penalty has been visited."

In U. S. v. Fifty-Three Boxes of Sugar, 2 Bond, 346, Fed. Cas. No. 15,098, a forfeiture was sought of certain sugars as having been entered as of a lower grade, and subject to a lower duty, than their real quality demanded. The absence of any fraudulent intent upon the part of the owner was offered as a defense, and sustained. The case arose under the act of March 3, 1863, § 1, which provided for a forfeiture of any goods when the owner, consignee, or agent "shall knowingly make, or attempt to make, an entry thereof by means of any false invoice, * * * or of any invoice which should not contain a true statement of all the particulars." The court said: "It is clearly incumbent on the government, in order to establish its right to a forfeiture, to bring the knowledge home to the parties charged with the fraud, as the basis of a judgment of forfeiture. * * * The fraudulent intent must also appear, and such intent must be fairly inferable from the facts proved, and cannot rest upon mere suspicion."

In an action brought to recover a penalty accruing under the forty-fourth section of the act of March 2, 1799, for the purchase and removal of certain empty casks, which had contained imported spirits, and from which the brands showing importation had not been removed, as required by the section cited, the purchase and removal having been made by a clerk in the employment of defendant, the jury were instructed that if, in their opinion, the defendant had no· agency in, or knowledge of, the purchase or removal of the casks, nor any acquiescence in the illegal proceedings of the clerk, although he might be the owner, in whole or in part, of the casks, he was not

liable to the penalties of the act, but the punishment should be visited on the offender, or the person who actually sold or removed the casks in violation of law. Upon the motion for a new trial the court overruled the motion, and, among other things, said:

"On general principles of responsibility of one for the acts of another, the defendant cannot be answerable penally, or even civilly, for acts not done by his direction, by his authority, with his knowledge, or within the scope of his authority. In the case of Parsons v. Armor, 3 Pet. 428, referred to by the district attorney, it is said that 'the general rule is that a principal is bound by the acts of his agent no further than he authorizes that agent to bind him.' It is truly added that 'the extent of the power given to an agent is deducible as well from facts as from express delegation.' In Daley's work on Agency (page 226): 'The responsibility of the master for the servant's negligence, or unlawful acts, is limited to cases properly within the scope of his employment.'" U. S. v. Halberstadt, 26 Fed. Cas. 68, Gilp. 262.

In U. S. v. Two Hundred and Eight Bags of Kainit, 37 Fed. 326, a forfeiture was sought of certain merchandise which had been feloniously taken when afloat on shipboard, and brought ashore in contravention of the revenue law, by persons unknown to the owner, and with the intention of depriving the owner of his property. Judge Simonton said:

"Whatever doubt may have existed on this subject, it has been removed by the act of 1874 (18 Stat. 189), which makes an actual intention to defraud an essential question in suits to enforce forfeitures under the customs laws. Sinn v. U. S., 14 Blatchf. 550, Fed. Cas. No. 12,906; Lewey v. U. S., 15 Blatchf. 1, Fed. Cas. No. 8,309. The question of fact which I must pass upon is 'whether the alleged facts were done with the actual intention to defraud the United States.' 1 Supp. Rev. St. p. 80, § 16; The Purissima Concepcion, 24 Fed. 358. This means an actual intent on the part of the owner, or of some person acting under his authority, or being his agent, or under whom he derives title. U. S. v. Diamonds, 30 Fed. 364. In this case the master and stevedore of the vessel had informed the claimant that all the cargo was discharged. Without the knowledge of the claimant, they concealed 208 bags of kainit in the ship. They left claimant's wharf and service, and then clandestinely and furtively sent the kainit ashore. Under the circumstances stated, the claimants cannot be charged with the consequences of this act, so as to forfeit their property."

In The Cargo Ex Lady Essex, 39 Fed. 765, a forfeiture of merchandise was sought upon the ground, among others, that the goods had been smuggled into the United States. The facts were that the schooner Victor, lumber laden, and bound from a Canadian port, arrived within the limits of the collection district of Port Huron, and there stranded. A part of her cargo was sold to the master of the schooner Lady Essex before the Victor had been authorized to unload, and contrary to section 2867, Rev. St. The master of the Essex, knowing that this cargo had not been properly unloaded, and the duty paid, fraudulently concealed the part purchased by him in the hold of his vessel, and proceeded to Mt. Clemens, and began to unload without reporting to the collector. Judge Brown (now Justice Brown) held that the lumber so sold the Essex and so smuggled in by the Essex was not forfeited, because the owner was not responsible for the wrongful acts of the master of either schooner. Among other things, the learned judge said:

"It is clear that goods taken and unloaded from a foreign vessel wrecked upon the coast are not subjected to a forfeiture because landed without a per-

mit. The Gertrude, 3 Story, 68, Fed. Cas. No. 5,370; Peisch v. Ware, 4 Cranch, 347; The Concord, 9 Cranch, 387; Merritt v. Merchandise, 30 Fed. 195. The stranding of the Victor made a clear case of unavoidable accident, necessity, or stress of weather, within the meaning of this section; and the only irregularity in the proceeding was the failure to give notice to the customs authorities of such contingency. No forfeiture, however, is imposed for the failure to give such notice, though it would seem, from the following section, that the vessel receiving such lumber from the stranded vessel incurs the penalty of forfeiture, and the master of such vessel a penalty of treble the value of the merchandise. While it is possible that section 2867 might be construed by inference to work a forfeiture of the cargo where no notice has been given of accident, necessity, or distress; still, although the statute may not be subject to the strict construction of a penal one, a forfeiture ought not to be imposed unless the language will bear no other reasonable construction. Sixty Pipes of Brandy, 10 Wheat. 421; U. S. v. Carr, 8 How. 1; U. S. v. Twenty-Four Coils of Cordage, Baldw. 502, Fed. Cas. No. 16,566. So far as a forfeiture is claimed by reason of the goods having been smuggled into the United States at Mt. Clemens, or, in the language of the statute, having been knowingly and willfully imported into the United States, contrary to law, the case depends upon different considerations. The authorities are direct to the proposition that the forfeiture of goods for violation of the revenue laws will not be imposed unless the owner of such goods or his agent has been guilty of an infraction of such laws. Peisch v. Ware, 4 Cranch, 347; The Waterloo, Blatchf. & H. 120, Fed. Cas. No. 17,257; Six Hundred and Fifty-One Chests of Tea v. U. S., 1 Paine, 507, Fed. Cas. No. 12,916; U. S. v. Two Hundred and Eight Bags of Kainit, 37 Fed. 326. It is clear that, if goods be stolen from the owner, or if a person has obtained possession of them fraudulently, or without authority, no act of his can forfeit them as against the true owner. Section 16 of the act of 1874 declares, in express terms, that in cases of this description it is the duty of the judge to submit to the jury, as a separate and distinct proposition, whether the alleged acts were done with an actual intention to defraud the United States; or, if such issues be tried by the court without a jury, it shall be the duty of the court to pass upon and decide such proposition as a distinct and separate finding of fact. This language must apply to the owner of the goods, or his authorized agents, and not to a mere trespasser."

But it is argued that the decisions we have quoted were made prior to the act of June 10, 1890, and that such changes were made by that act in the law as to result in a forfeiture without regard to the conduct of the owner, or his control over the person violating the law. For the purpose of contrasting the provisions of the act of 1874, under which were decided the two cases of U. S. v. Two Hundred and Eight Bags of Kainit and The Cargo Ex Lady Essex, cited above, we here set out sections 12 and 16 of the act of 1874, and section 9 of the act of June 10, 1890:

Sections 12 and 16 of the act of 1874 are as follows:

"Sec. 12. That any owner, importer, consignee, agent or other person who shall, with intent to defraud the revenue, make or attempt to make, any entry of imported merchandise, by means of any fraudulent or false invoice, affidavit, letter or paper, or by means of any false statement, written or verbal, or who shall be guilty of any willful act or omission, by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper or statement, or affected by such act or omission, shall, for each offense, be fined in any sum not exceeding five thousand dollars nor less than fifty dollars, or be imprisoned for any time not exceeding two years, or both; and, in addition to such fine, such merchandise shall be forfeited; which forfeiture shall only apply to the whole of the merchandise in the case or package containing the particular article or articles of merchandise to which such fraud or alleged fraud relates; and anything contained in any act which provides for the forfeiture or confiscation of an entire invoice

in consequence of any item or items contained in the same being undervalued, be, and the same is hereby, repealed."

"Sec. 16. That in all actions, suits and proceedings in any court of the United States now pending or hereafter commenced or prosecuted to enforce or declare the forfeiture of any goods, wares or merchandise, or to recover the value thereof, or any other sum alleged to be forfeited, by reason of any violation of the provisions of the customs-revenue laws, or any of such provisions, in which action, suit or proceeding, an issue or issues of fact shall have been joined, it shall be the duty of the court, on the trial thereof, to submit to the jury as a distinct and separate proposition, whether the alleged acts were done with an actual intention to defraud the United States, and to require upon such proposition a special finding by such jury: or, if such issues be tried by the court without a jury, it shall be the duty of the court to pass upon and decide such proposition as a distinct and separate finding of fact; and, in such cases, unless intent to defraud shall be so found, no fine, penalty or forfeiture shall be imposed."

## Section 9 of the act of June 10, 1890, is as follows.

"That if any owner, importer, consignee, agent or other person shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from the person making the entry, shall be forfeited, which forfeiture shall apply only to the whole of the merchandise, or the value thereof, in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates:

"And such person shall, upon conviction, be fined for each offense a sum not exceeding five thousand dollars, or be imprisoned for a time not exceeding two years, or both, in the discretion of the court."

For the United States it has been very earnestly argued that the omission of the words "with intent to defraud" from the ninth section of this act of 1890, and the repeal of the sixteenth section of the act of 1874, without the substitution of anything substantially the same, works a most significant change in the law, and that a forfeiture of the goods of the owner results from the doing of the acts forbidden, or the failure to do the acts required, by any person dealing with the merchandise seized, without any regard to the complicity of the owner, or his responsibility for the conduct of the person who actually violated the law. In other words, the contention is that the merchandise is forfeited, without any regard to the innocence of the owner, provided it appear that any person has done or attempted to do any of the acts prohibited in respect to the merchandise seized, or omitted to do any act required to be done for the protection of the revenue. The competency of the congress to impose the penalty of forfeiture upon merchandise which is unlawfully brought into this country, irrespective of the circumstances under which it came in, or the intent with which it was brought in, or the responsibility of the owner for the acts of those bringing it in, cannot be doubted. The maxim that crime proceeds only from a criminal intent has its exceptions, and is not of universal application. The lawmakers may declare any act criminal without respect to the motive of the doer of the act. In respect to statutory offenses, an evil intent is not nec-

essarily an ingredient, and the offense may be complete if such is the plain intent of the lawgiver. The cases are numerous in which these principles are recognized, and they are collected in U. S. v. Curtis, 16 Fed. 184, and in the argument of the attorney general in the case of Halsted v. State, 41 N. J. Law, 577–583. The statute under consideration is highly penal, and as such falls within the general rule which requires a strict construction. U. S. v. Eighty-Four Boxes of Sugar, 7 Pet. 453. We must so construe it as to carry out the obvious intention of congress; but, being penal, every case must come, not only within its letter, but within its spirit and purpose. We must have regard to the maxim, "Actus non facit reum nisi mens sit rea;" and, unless it clearly and unequivocally appears that the lawmaker intended a forfeiture without regard to the conduct or intent of the owner, there can be no condemnation of the claimant's property. The case of Reg. v. Tolson, 23 Q. B. Div. 168, is an instructive case upon this subject of criminal intent as a prerequisite to crime; and in the able work of Mr. Sutherland upon Statutory Construction (sections 346–407) may be found an admirable consideration of the rigid rule applicable in the construction of penal statutes generally.

From the cases already cited it most clearly appears that under the act of 1874, as well as under the collection acts antecedent, a forfeiture was never declared of the goods of an owner unless there was an actual intent upon the part of the owner, or those under whom he claimed, or his authorized agent, to defraud the revenue; and the merchandise of an owner was not subjected to forfeiture by the acts and conduct of a mere stranger and trespasser. From a comparison of the acts of 1874 and 1890 it is evident that under neither can there be a condemnation unless there be an attempt to make an entry by means of some fraudulent or false invoice, affidavit, letter, or paper, or some other false or fraudulent practice or appliance, or there shall be some "willful act or omission," by means whereof the United States shall be deprived of the lawful duties. Now, it is clear that under either of these acts there may be a person who has done one or all of these acts, or used one or all of these means, in respect to goods not his own, and in respect to which he is a trespasser; and that his intent was, for his own private purposes, to cheat and defraud the United States. Such a person would undoubtedly be liable to the penalties of either act, for both acts contemplate and authorize a criminal proceeding, independently of a civil proceeding, for the condemnation of merchandise which has been the subject of the fraudulent acts mentioned in the law. If the person guilty of these violations of the law be also the owner of the merchandise, he may be punished by a forfeiture of his goods in addition to punishment by fine, etc. But a proceeding for the forfeiture of the merchandise may be instituted irrespective of any criminal proceedings, for the owner of the goods may be an entirely different person from the person liable criminally. Origet v. U. S., 125 U. S. 240, 8 Sup. Ct. 846. Undoubtedly, Elliott was a person who, on the facts found below, might have been prosecuted criminally; but, unless he was the owner of the merchandise

which was the subject of his fraudulent practice, there could have been no valid condemnation of the celluloid as a part of a judgment against him.

If it be conceded that by the repeal of the sixteenth section of the act of 1874, and by the omission from the language of the ninth section of the act of June 10, 1890, of the words "with intent to defraud," that congress has intended to eliminate all question of the intent of the doer of the acts for which a forfeiture results,—a concession which we do not make,—how far has the government advanced its contention? That Elliott intended to defraud the United States is not debatable. If his intent would affect the claimant's title, then, even under sections 12 and 16 of the act of 1874, a case for the forfeiture of the goods of an innocent owner would be made out. But we have already seen by the cases heretofore cited that under all the preceding collection acts, including that of 1874, there could be no forfeiture unless the owner, or some agent for whose acts he was responsible, or some one under whom the owner claimed, had, with intent to defraud, done the acts prohibited, or left undone willfully some of the acts required, that there could be no forfeiture.

In U. S. v. Two Hundred and Eight Bags of Kainit, 37 Fed. 326, there was no doubt of the intent with which the trespasser had made the unlawful removal of the merchandise involved in that case. The forfeiture was defeated because the owner had not done or authorized these acts, and could, therefore, have had no guilty intent; and the case was decided against the government because it was necessary to show an actual intent on the part of the owner, or some person acting under his authority, or under whom he derived title. So, in the case of The Cargo Ex Lady Essex, 39 Fed. 765, there was no doubt of the intent of the master of the Lady Essex. But the owner of the merchandise had not attempted to smuggle the goods into the United States, nor authorized the acts of those who had made such an attempt, and therefore could have no intent to defraud; and the language of sections 12 and 16 of the act of 1874 was construed by Judge Brown to "apply to the owner of the goods, or his authorized agent, and not to a mere trespasser." The utmost effect which can be claimed as a consequence of the differences between the acts of 1874 and 1890 is that the intent with which the law was violated is not an ingredient in a proceeding for a forfeiture. That the acts made a ground for forfeiture shall be done by the owner, or some one for whom he is responsible, or under whom he derives title, is just as essential under the act of 1890 as it was under any of the preceding statutes. But it is said that by the ninth section of the act of June 10, 1890, it is provided that, if any "owner, importer, consignee, agent, or other person" do, in respect to the goods seized, any of the forbidden things, a forfeiture results, and that, if Elliott was neither the owner nor the consignee, importer, or agent, he is included in the words "other person." These words "other person" appeared in the same connection in the twelfth section of the act of 1874. The descriptive words preceding all describe some person having a relation to the owner,

and for whose conduct, in respect to his merchandise, he may be responsible. The words "other person," when a forfeiture of merchandise is sought, mean some one of the same general class as those described by the words with which it is associated. The rule "Noscitur a sociis" has application. Newport News & M. Val. Co. v. U. S., 22 U. S. App. 145, 148, 9 C. C. A. 579, and 61 Fed. 488; 17 Am. & Eng. Enc. Law (1st Ed.) p. 280. We see nothing in the act of 1890 which would justify the court in holding it subject to the harsh and inequitable construction sought to be placed upon it. There is no language which indicates a purpose to so radically depart from the spirit of the former collection statutes, as to condemn the property of an innocent owner for the acts of a mere trespasser.

The writ of error must be dismissed, and the judgment of the district court affirmed.