581 DIAMONDS (VAN ANTWERPEN et al., Claimants) v. UNITED STATES.

(Circuit Court of Appeals, Sixth Circuit. January 6, 1903.)

No. 1,083.

1. CUSTOMS LAWS—FORFEITURE OF SMUGGLED GOODS—RIGHT OF VENDOR TO RECLAIM GOODS OBTAINED BY FRAUD.

A seller of goods, which were delivered to the purchaser, although having the right, as against the purchaser, to rescind the sale and recover the goods, because they were obtained by means of fraudulent representations and with the intention on the part of the purchaser not to pay for the same, cannot assert such right against the right of the United States to forfeit the goods, where they were seized when the purchaser, while thus clothed with ownership and possession, was attempting to smuggle them into the country in violation of its customs laws.

In Error to the District Court of the United States for the Eastern District of Michigan.

On the 6th of July, 1899, the district attorney of the United States for the Eastern district of Michigan, filed an information seeking to condemn 581 diamonds, alleged to have been forfeited. The record discloses that these goods were seized when about to be unlawfully imported and smuggled into the United States on June 28, 1899, at Detroit, Mich., by one Louis Bush. Proceedings were duly had resulting in a judgment of forfeiture, which, so far as Bush is concerned, is not now contested. On the 22d of January, 1900, the firm of Van Antwerpen & Van Den Bosch were allowed to intervene and plead in the case. These parties claimed the diamonds as against the right

of the government to forfeit the same, and after further proceedings (not necessary to set out) were allowed to file an amended answer in the case setting up their claim, which is as follows:

The amended answer of Charles B. Van Antwerpen and Jean C. Van Den Bosch, the respondents to the above action, and intervening therein, now and at all times hereinafter saving to themselves any and all manner of benefit and exception that can or may be had or taken to the errors, uncertainties, and imperfections in the libel of information filed herein, for answer thereto, or to so much thereof as these defendants are advised is material and necessary to make answer to, answering say:

First. That they are now, and were at all times hereinafter set forth, co-partners doing business in the city of Antwerp, kingdom of Belgium, under the firm name and style of Van Antwerpen & Van Den Bosch, dealing in diamonds, cut and uncut.

Second. That on or about the 6th day of June, in the year 1899, one Max Hurvich called upon respondents and stated that he desired to purchase diamonds from respondents.

Third. Said Hurvich represented to respondents that he had been theretofore engaged in the clothing business in the city of New York, United States of America, but had given up said business and was about to engage in the purchase and sale of diamonds in said city of New York, and would make his office and place of business at the premises number nine (9) Maiden Lane, in said city; that he had considerable means, and was worth over and above all his liabilities upwards of the sum of forty thousand dollars ($40,000), and desired to purchase from respondents diamonds on credit, and was making these representations as to his financial standing for the purpose of inducing respondents to give him a line of credit.

Fourth. That for the purpose of inducing respondents to give him a line of credit he did then and there further represent to respondents that he had theretofore had business dealings with certain persons residing in the city of New York, and that all his dealings with such persons has been satisfactory to such persons; that so far as respondents can remember the persons so referred to by said Hurvich are Roseman, Maiden Lane, New York.

Fifth. As a further inducement why respondents should sell diamonds to said Hurvich, he represented to respondents that, in order to prepare to conduct and carry on the business in which he was about to engage, he needed large sums of cash, and therefore was not able to pay cash to respondents for all the goods which he at that time desired to purchase.

Sixth. Said Hurvich further represented to respondents that within six or seven months he would realize cash from some of his other property, and would be in a position to pay whatever there might be due on the unpaid purchase price of whatever diamonds he might purchase of respondents, and that his property was amply sufficient to enable him to raise all the funds that he might need for that purpose.

Seventh. Respondents, further answering, show that they believed each and every of said representations so made by said Hurvich to be true, and in reliance thereon did, on said 6th day of June, 1899, sell and deliver to said Hurvich, at said city of Antwerp, a large number of diamonds, to wit, upwards of five hundred and twenty-five (525) diamonds of various weights and measurements, to the value of four thousand two hundred and seventy-seven (4,277) pounds, twelve (12) shillings, and six (6) pence in English money, and in reliance upon the truth of said statements so made as aforesaid by said Hurvich did give said Hurvich credit on the purchase price of said diamonds to the extent of two thousand two hundred and seventy-seven (2,277) pounds, twelve (12) shillings, and six (6) pence in English money, and did agree to allow said Hurvich until the 18th day of December, 1899, to pay said last-mentioned sum, which said last-mentioned sum it was agreed said Hurvich should pay at London, England.

Eighth. Respondents, further answering, show that since the aforesaid purchase from respondents said Hurvich has admitted that at the time of said purchase he had formed the purpose of obtaining said diamonds without paying therefor the said sum of two thousand two hundred and seventy-

seven (2,277) pounds, twelve (12) shillings, and six (6) pence so remaining unpaid as aforesaid on the purchase price; and, further, that prior to the purchase of said diamonds; and at the time of the purchase thereof, he had formed the purpose of obtaining said diamonds without paying the full purchase price thereof, and with the intention and purpose of raising money on them by pledging or selling them to pawnbrokers or other persons who might be found willing to lend money thereon, or to purchase them at prices below their market value.

Ninth. Respondents, further answering, show that in furtherance of said fraudulent purpose and design said Hurvich did not pay said sum of two thousand two hundred and seventy-seven (2,277) pounds, twelve (12) shillings, and six (6) pence when the same became due as aforesaid, at the city of London, England, on the said 18th day of December, 1899.

Tenth. Respondents, further answering, say that they are advised and believe, and upon such information and belief they charge the fact to be, that said Hurvich, with said diamonds in his possession, proceeded directly from said city of Antwerp to the dominion of Canada, and there met one Louis Bush, who, your respondents charge, was a confederate of said Hurvich, and did then and there turn over and deliver to said Bush the said diamonds so as aforesaid obtained from respondents.

Eleventh. Respondents, further answering, say that since their former answer herein said Hurvich has admitted that the said diamonds now in the possession of the said court are a portion of those so obtained as aforesaid from respondents.

Twelfth. Respondents, further answering, say that, had they known at the time said representations so made as aforesaid by said Hurvich to them to be untrue, they (said respondents) would not have surrendered and delivered up said diamonds to said Hurvich.

Thirteenth. Respondents, further answering, say that the said representations made by the said Hurvich to said respondents, and upon which said respondents relied in making the sale and delivery of said diamonds, were each and every of them false and untrue, and respondents show that said Hurvich was not on said 6th day of June, 1899, worth over and above all liabilities upwards of the sum of forty thousand dollars ($40,000); and respondents further show that the dealings of said Hurvich with the persons mentioned in the fourth paragraph of this answer had not been satisfactory to said persons; and respondents, further answering, deny that said Hurvich on said 6th day of June, 1899, had any property whatsoever from which he could realize cash within six or seven months after said last-mentioned date, as he told respondents he would be able to do; and respondents deny that he had any property sufficient to enable him to raise all the funds that he might need for the purpose of paying these respondents.

Fourteenth. Respondents, further answering, show that said representations so made as aforesaid by said Hurvich were false and untrue, and made for the purpose of inducing these respondents to part with said diamonds to said Hurvich without receiving full payment therefor, and in furtherance of a fraudulent scheme and purpose theretofore entered into by and between said Hurvich, one Louis Bush, and one Louis Rosenberg of said city of New York, wherein and whereby it was agreed that said Hurvich should obtain said diamonds of your respondents by fraud and deceit, and when obtained he, with said Bush and said Rosenberg, should dispose of the same and the proceeds therefrom share with said Bush and Rosenberg.

Fifteenth. Respondents, further answering, say that they have been told that said Louis Rosenberg, named in the answer filed by said Louis Bush herein, is a pawnbroker in the city of New York, and they deny that said Louis Rosenberg is the owner of said diamonds, or any or either of them.

Sixteenth. Respondents, further answering, show that said five hundred and eighty-one (581) diamonds seized by the officers of the United States government, and which are the diamonds now being proceeded against in this honorable court, are some of the same diamonds so fraudulently obtained by them by said Hurvich.

Seventeenth. Respondents, further answering, show that they are prepared to repay, and do now tender, to this honorable court, or to such person as

this court may determine to be entitled thereto, the said sum of two thousand (2,000) pounds, so paid as aforesaid by said Hurvich to respondents as a part of the purchase price of said diamonds.

Wherefore respondents pray that upon the final hearing herein this honorable court may order and decree that the diamonds seized herein be, and are, the rightful property of the respondents, and that the same be restored to them free of duty; and they pray for such other and further relief as this honorable court may deem just and proper under the circumstances.

The district attorney filed exceptions raising the question of the sufficiency of this answer to entitle the claimants to the relief prayed for. These exceptions were sustained by the district judge, who found that Van Antwerpen & Van Den Bosch were not entitled to the goods, but the same were adjudged forfeited to the United States. From this order and judgment a writ of error is taken to this court.

Bowen, Douglas & Whiting (Peter Zucker, of counsel), for plaintiffs in error.

Wm. D. Gordon, U. S. Atty., and James V. D. Willcox, Asst. U. S. Atty.

Before LURTON, DAY, and SEVERENS, Circuit Judges.

DAY, Circuit Judge, after making the foregoing statement, delivered the opinion of the court.

As between the government and Bush there can be no question that the right to forfeit the goods seized has been fully and clearly made out. Bush was caught with the diamonds concealed in his shoes. He denied all knowledge of how he came to be thus possessed of the gems when entering the port of Detroit. On his way to the prison he practically confessed his offense in saying to the officer: "Now, if you have got all that you are looking for, let me go." The only question of importance in the case is as to the sufficiency of the amended answer of Van Antwerpen & Van Den Bosch to require the diamonds to be returned to them, instead of forfeited to the government. If the diamonds were imported in violation of the statute, it is established law that the forfeiture dates from the time of the commission of the wrongful act and binds the goods from that date. Henderson's Distilled Spirits, 14 Wall. 44, 20 L. Ed. 815. For the purposes of this inquiry we may regard the amended answer of the claimants as true. Thus treated, it makes allegations sufficient to establish the fraudulent character of the purchase of the diamonds by Hurvich. It is distinctly averred that not only did Hurvich make false statements to induce the sale as to his financial responsibility, but it is alleged that the goods were purchased in furtherance of a fraudulent scheme not to pay for them. In such case there can be no doubt of the right of the vendor to rescind the sale and recover the goods in the hands of the vendee, or from others than innocent purchasers for value. The rule is thus tersely stated by Mr. Justice Davis, in Donaldson v. Farwell, 93 U. S. 631, 23 L. Ed. 993:

"The doctrine is now established by a preponderance of authority that a party not intending to pay, who, as in this instance, induces the owner to sell him goods on credit by fraudulently concealing his insolvency and his intent not to pay for them, is guilty of a fraud which entitles the vendor, if no innocent third party has acquired an interest in them, to disaffirm the contract

and recover the goods. Byrd v. Hall, *41 N. Y. 647; Johnson v. Monell, Id. 655; Noble v. Adams, 7 Taunt. 59; Kilby v. Wilson, Ryan & M. 178; Bristol v. Wilsmore, 1 Barn. & C. 514; Stewart v. Emerson, 52 N. H. 301; Benj. Sales, § 440, note of the American editor, and cases there cited."

In Morrow Shoe Mfg. Co. v. New England Shoe Co., 6 C. C. A. 515, 57 Fed. 693, 24 L. R. A. 417, it is said:

"The seller, on discovering the fraud, may affirm the sale and sue for the price, or he may disaffirm it and reclaim the goods, or he may proceed criminally."

Notwithstanding the fraud, if there is an intention to part with the title, as well as the possession, the title passes subject to the right of the vendor to rescind the sale and reclaim the property. Benj. Sales, § 517. It is the intent of the law, so far as the forfeiture feature is concerned, to work that result only in cases where the owner, or some of those named in the statute, in his interest, are guilty of the attempt to defraud the revenue. Origet v. U. S., 125 U. S. 240, 8 Sup. Ct. 846, 31 L. Ed. 743; U. S. v. 1150½ Pounds of Celluloid, 27 C. C. A. 231, 82 Fed. 627. The contention in this case is that neither Hurvich nor Bush were the owners of the goods, and that the real ownership as against the government's claim was in the claimants. When the goods were delivered to Hurvich under the circumstances detailed in the amended answer, he became the owner of them. He had the unqualified right to the possession thereof. He might lawfully remove them. That he intended to import them into the United States was well known to the vendors; not, it is true, with authority of the sellers to smuggle them into the country, but the control and possession of the property was delivered up, leaving the vendors to the right to rescind if they chose and recover the property. But there was always the chance that before the vendor became acquainted with the facts, or after knowledge and before action was determined upon, the one who had the ownership and control of the property might change its status so as to render ineffectual the right to rescind. The authorities agree that this would be the result of a sale to an innocent purchaser. It might be incumbered in favor of one who dealt in good faith on the strength of the apparent ownership and title.

The question made is: Can the vendor assert this right against the right of the United States to forfeit the goods, when the one thus clothed with title and possession has attempted to smuggle them into the country in violation of its revenue laws? The statute under which forfeiture is claimed by the government is as follows:

"That if any owner, importer, consignee, agent or other person shall make or attempt to make any entry of imported merchandise by means of any fraudulent or false invoice, affidavit, letter, paper, or by means of any false statement, written or verbal, or by means of any false or fraudulent practice or appliance whatsoever, or shall be guilty of any willful act or omission by means whereof the United States shall be deprived of the lawful duties, or any portion thereof, accruing upon the merchandise, or any portion thereof, embraced or referred to in such invoice, affidavit, letter, paper or statement, or affected by such act or omission, such merchandise, or the value thereof, to be recovered from the person making the entry, shall be forfeited, which forfeiture shall apply only to the whole of the merchandise, or the value thereof, in the case or package containing the particular article or articles of merchandise to which such fraud or false paper or statement relates. And

such person shall, upon conviction, be fined for each offense a sum not exceeding five thousand dollars, or be imprisoned for a time not exceeding two years, or both, in the discretion of the court." Act June 10, 1890, § 9, 1 Supp. Rev. St. p. 749 [U. S. Comp. St. 1901, p. 1895].

Statutes to prevent frauds upon the revenue are considered to be enacted for the public good, and therefore, although they impose penalties or forfeitures, are not to be construed like penal laws generally, but are to be fairly and reasonably construed, so as to carry out the legislative intent. U. S. v. Stowell, 133 U. S. 1, 10 Sup. Ct. 244, 33 L. Ed. 555. It will be observed that the wrongful act, in order to work the forfeiture, must be done by "the owner, importer, consignee, agent, or other person." It is the attempt of this class of persons to evade the revenue laws of the United States; that is, to deprive the owner of his property as a punishment for such unlawful practice. In U. S. v. 1,150½ Pounds of Celluloid, 27 C. C. A. 231, 240, 82 Fed. 627, this court held that the descriptive words following the term "owner," to wit, "importer, consignee, agent," all describe some person having a relation to the owner, and for whose conduct in respect to his goods he may be responsible. It was further held that "other person," as here designated, meant some one of the same general class as those described in the associated terms used in the statute. It is, then, primarily the "owner" who is to be reached and punished by the forfeiture. When these goods were attempted to be smuggled in by Bush, it is directly averred that he was acting in collusion with Hurvich. If the averments of the amended answer are true, the latter, the legal owner of the goods, was deep in this scheme to defraud the revenue.

The statute is plain and clear in visiting the penalty of forfeiture upon the owner and his importer, consignee, or agent. Are we at liberty to so modify the statute as to qualify this right by reading into it an exemption of property, which, though fraudulently imported by the owner, is in such situation as to title that, because of the fraud of the owner, another might have claimed the property and devested the title? We cannot perceive on what principle we may do this. When an act comes within the terms of the statute, working a forfeiture which may entail a hardship, it is nevertheless to be enforced, not repealed or modified, by the courts. The right of congress to pass suitable revenue laws is conceded. It is the business of the courts to enforce such as are constitutionally passed. "Congress possesses the power to levy taxes, duties, imports, and excises, and it is as clear that congress may enact penalties and forfeitures for the violation of such laws as it is that congress may levy the taxes or duties or pass laws for their collection, safe-keeping, and disbursement." Henderson's Distilled Spirits, 14 Wall. 44–59, 20 L. Ed. 815.

So frequent are attempted frauds upon revenue laws that the wisdom of congress cannot be doubted in making strict regulations, which shall preserve the revenue of the government and prevent undue privileges to those who seek to enter the markets against the honest importer with the unlawful advantage of free goods gained by fraudulent acts and practices. When the owner has forfeited the goods by the unlawful acts shown in this case and admitted in the answer, the

119 F.—36

operation of the statute seems clear, and the only judicial function is to enforce the law. To permit secret claims of ownership to be asserted after forfeiture would be in plain violation of the written law.

We have been unable to find any reported case which goes the length asked by the plaintiffs in error here. Two of those relied upon were reviewed by this court in U. S. v. 1,150½ Pounds of Celluloid, supra. Of them Judge Lurton said:

"In U. S. v. 208 Bags of Kainit (D. C.) 37 Fed. 326, there was no doubt of the intent with which the trespasser had made the unlawful removal of the merchandise involved in that case. The forfeiture was defeated because the owner had not done or authorized these acts, and could, therefore, have had no guilty intent; and the case was decided against the government because it was necessary to show an actual intent on the part of the owner, or some person acting under his authority, or under whom he derived title. So, in the case of The Cargo ex Lady Essex (D. C.) 39 Fed. 765, there was no doubt of the intent of the master of the Lady Essex. But the owner of the merchandise had not attempted to smuggle the goods into the United States, nor authorized the acts of those who had made such an attempt, and therefore could have no intent to defraud; and the language of sections 12 and 16 of the act of June 22, 1874, was construed by Judge Brown to 'apply to the owner of the goods, or his authorized agent, and not to a mere trespasser.'"

In the Celluloid Case the claim was made that the act of June 10, 1890 [U. S. Comp. St. 1901, p. 1886], was broad enough to require the forfeiture of the goods, although the owner was wholly guiltless of any participation in the attempted fraud. In that case the celluloid was stored in Windsor. It was attempted to be smuggled into Detroit by an employé, who was acting without authority and for his own unlawful gain. It was held that this did not forfeit the goods as against the innocent owner. In all the cases cited the goods were not given over by the owner, but were taken wholly without authority and by acts which practically amount to theft or trespass. In holding against the claim of forfeiture the courts have construed the statute as not intending to take the property of the owner for the wrongful or criminal acts of others wholly unauthorized in the premises. In the present case, while there may have been the right to rescind this sale for fraud, it was the act of the owner in attempting to defraud the revenue which brings the case within the terms of the statute.

We find no error in the proceedings in the district court, and its judgment will be affirmed.